

# COMMONWEALTH OF MASSACHUSETTS
## LAND COURT
## DEPARTMENT OF THE TRIAL COURT

**CIVIL ACTION**

NO. 19 MISC 000265

Bradford Brooks and Lloyd Jennings, as Trustee of the L&B Realty Trust; Stavros Dimakis d/b/a Mark's Deli; and Stavros Dimakis as Trustee of Evthokia Realty
_____ **Plaintiff(s)**

v.

City of Haverhill; Haverhill Stem, LLC; Pineau Projects, LLC; and The Westland Group LL(
_____ **Defendant(s)**

Commonwealth
of
Massachusetts
A TRUE COPY ATTEST
R. Scott Confreda
Former Chief-che
Deputy Sheriff,
Middlesex County
Constable/City of
Several Municipalities
& Interested Party
Notary Public
Commission Expires
6/4/19

## SUMMONS

To the above-named Defendant: CITY OF HAVERHILL

You are hereby summoned and required to serve upon Nathanson & Goldberg, P.C., ATTN: Alvin S. Nathanson, Esq. and Scott A. Schlager, Esq.

Plaintiff's attorney, whose address is Two Atlantic Ave., 5th Fl., Boston, MA 02110 , an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Recorder of this court at Three Pemberton Square, Room 507, Boston, MA 02108 either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Gordon H. Piper, Chief Justice, at Boston, _____

_____

_Deborah J. Patterson_
Recorder

**NOTES**

1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.

2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED
   (1) EQUITY — (2) OTHER

_NOTICE TO DEFENDANT - You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Land Court at the address herein provided._

| SUMMONS and HEARING NOTICE<br>for ☒ Preliminary Injunction<br>☐ Lis Pendens | DOCKET NUMBER<br><br>19 MISC 000265 | Commonwealth of Massachusetts<br>∴ Land Court<br>Department of The Trial Court |
|---|---|---|

| CASE NAME:<br><br>J. Bradford Brooks Trustee of the L&B Realty Trust, et al.<br>Plaintiff(s)<br>v.<br><br>City of Haverhill , et al.<br>Defendant(s) | COURT ADDRESS & PHONE NUMBER<br><br>Land Court<br>Three Pemberton Square<br>Room 507<br>Boston, MA 02108<br><br>(617)788-7470 |
|---|---|

**Commonwealth of Massachusetts**

| PLAINTIFF'S ADDRESS TO SERVE RESPONSE TO COMPLAINT<br><br>Alvin S Nathanson, Esq.<br>Nathanson & Goldberg, P.C.<br>2 Atlantic Ave<br>Fifth Floor<br>Boston, MA 02110 | HEARING DATE AND TIME<br>06/07/2019 at 12:00 PM<br><br>ASSIGNED JUSTICE<br>Hon. Robert B. Foster<br><br>Daily courtroom assignments are<br>posted in the 5th floor lobby. |
|---|---|

A TRUE COPY ATTEST,

R. Scott Gonfrade
Former Chief-civil
Deputy Sheriff,
Middlesex County
Constable of
Several Municipalities
Disinterested Party
Notary Public

Date of L.: 6/4/19

**TO THE DEFENDANT:**   City of Haverhill

This Summons lets you know that the Plaintiff has filed a lawsuit against you in the Land Court. A copy of the Plaintiff's Complaint filed against you is attached to this Summons.  The Plaintiff has also filed with the Court the following application(s), which are either included in the Complaint or attached to this Summons:

☐ Application for Approval of a Memorandum of Lis Pendens (request for a document that can be recorded in the Registry of Deeds to notify others of this pending lawsuit involving or affecting certain property).

☒ Application for Preliminary Injunction (request for an order from the court compelling a party to do or refrain from doing a specified act).

A hearing in this matter is scheduled before a judge on the date and time shown above.
**You must appear at this hearing if you wish to be heard on whether the Court should grant the application(s).**

☐ **If this box is checked,** the judge has issued a Temporary Restraining Order, which is in effect now and stays in effect until the scheduled hearing is held.  (See separate Temporary Restraining Order attached to this Notice.)

If you believe you will need the services of an interpreter, a hearing assistance device, or any other accommodation, please contact the Sessions Clerk for the Assigned Justice to make the necessary arrangements as soon as possible before the scheduled hearing.  To find Sessions Clerk contact information, call the phone number listed above or search "Land Court Session Clerk" at www.mass.gov.

## YOU MUST ACT PROMPTLY TO PROTECT YOUR INTERESTS

To protect your interests, you must respond to this lawsuit in writing within 20 days. If you do not respond, you may lose the chance to tell your side, and the Court may decide the case against you by default and award the Plaintiff everything asked for in the Complaint.  If you need more time to respond, you may request an extension of time from the Assigned Justice by filing a written motion.

*(Continued on Page 2)*

| SUMMONS and HEARING NOTICE **for** ☒ Preliminary Injunction ☐ Lis Pendens | DOCKET NUMBER 19 MISC 000265 | Commonwealth of Massachusetts Land Court Department of The Trial Court |
|---|---|---|

## To respond, you must:

    1. File your response with the Land Court Recorder's Office at the court address listed on Page 1;

AND

    2. Serve a copy of your response on the Plaintiff in accordance with the Massachusetts Rules of Civil Procedure.

**Many Land Court cases are complex and you may wish to get legal help from a lawyer.** One form of legal help is Limited Assistance Representation (LAR), where an attorney represents or assists you with part, but not all, of your case.  Information about LAR is available at www.mass.gov.

If you do not get legal help, some basic information for people who represent themselves in court is available by searching "Courts Self Help" at www.mass.gov.  The Rules of Civil Procedure and court rules may be found by searching "Court Rules" at www.mass.gov.

**Required information on all court filings.**  The "docket number" appearing at the top of this notice is the number assigned to this particular case and must appear on all documents you file with this Court.  As the person being sued, you are the "Defendant" and you should refer to yourself as the Defendant in all your filings.

| WITNESS Hon. Gordon H. Piper, Chief Justice | DATE ISSUED: May 30, 2019 | RECORDER:  Deborah J. Patterson *Deborah J. Patterson* |
|---|---|---|

## RETURN OF SERVICE
### (for use by person making service on behalf of Plaintiff)

I certify that on _____, I served a copy of the within Summons, together

with a copy of the Complaint in this case, upon the named Defendant in the following manner (see Mass. R. Civ. P. 4

(d)(1)-(5)):

_____

_____

_____

_____

_____

_____

_____

DATED:

SIGNATURE:

X



COMMONWEALTH OF MASSACHUSETTS

LAND COURT
FILED

ESSEX, SS.

LAND COURT DEPARTMENT 2019 MAY 30 PM 3: 56
OF THE TRIAL COURT

J. BRADFORD BROOKS and LLOYD )
JENNINGS, as TRUSTEES of the L&B )
REALTY TRUST; STAVROS DIMAKIS )
d/b/a Mark's Deli; and STAVROS DIMAKIS )
as TRUSTEE of EVTHOKIA REALTY TRUST )

19 MISC 000265

Vs. )

CITY OF HAVERHILL; HAVERHILL )
STEM, LLC; PINEAU PROJECTS, LLC )
and THE WESTLAND )
GROUP LLC. )

Commonwealth
of
Massachusetts

TRUE COPY ATTEST,

May 30, 2019

R. Scott Gonfrade
Former Chief-civil
Deputy Sheriff,
Middlesex County
Constable of
Several Municipalities
Disinterested Party
Notary Public
My Commission Expires

ALLOWED

Robert B. Foster
Justice

6/4/19

### MOTION FOR APPOINTMENT OF A SPECIAL PROCESS SERVER
### UNDER M.R.Civ.P. 4

Now come the plaintiffs in the above-captioned action and moves this Honorable Court

pursuant to Rule 4, 4.1 and 4.2 of the Massachusetts Rules of Civil Procedure that this Court

appoint Constable Scott Gonfrade of Framingham, MA (formerly Chief of the Civil Division of

the Middlesex Deputy Sheriff's Office) and licensed as a Constable in various cities and towns

as process server in this matter during the pendency of this case in order to assure a substantial

savings in time and cost. Plaintiff states that said appointment is required to effectuate speedy

service of process. The undersigned swears that to the best of their knowledge and belief, the

person to be appointed is eighteen years of age or over and is not a party in this case.

As grounds therefore, the plaintiff states that to the best of its knowledge and belief, the

person to be appointed process server is a constable duly licensed to serve process in the

Commonwealth of Massachusetts and has had extensive experience in serving civil process in all

of the Trial Courts in the Commonwealth.

Respectfully submitted,

PLAINTIFFS',

By their attorneys,

DATE: May 30, 2019

Alvin S. Nathanson, BBO # 367480
Scott A. Schlager, BBO #695421
NATHANSON & GOLDBERG, A
PROFESSIONAL CORPORATION
Two Atlantic Avenue, 5th Floor
Boston, MA 02109
Tel: (617) 210-4800
Fax: (617) 210-4824
asn@natgolaw.com
sas@natgolaw.com

This action came on for hearing before the Court, _____, presiding, upon
Plaintiff's Motion for Appointment of a Person to Serve Process, and thereupon, after
consideration thereof, it is ORDERED AND ADJUSDGED that Scott Gonfrade be appointed
special process server for the express purpose of serving any and all process in this action
pursuant to Massachusetts Rule 4, 4.1 and 4.2 of Civil Procedures.

Date: _____          By: _____
                                    Title: _____



**Trial Court of Massachusetts**
**Land Court Department**

| DOCKET NUMBER | COURT USE ONLY |
|---|---|
| 19 MISC 000265 Judge Foster | LAND COURT FILED |

## CIVIL COVER SHEET
(For use in all Land Court case types except tax foreclosures, mortgage foreclosures under the Servicemembers Civil Relief Act, and all cases related to original and subsequent registration under G. L. c. 185, §1)

2019 MAY 30 PM 3: 56

**CASE NAME**

J. Bradford Brooks and Lloyd Jennings, as Trustees of the L&B Realty Trust; Stavros Dimakis d/b/a Mark's Deli; and Stavros Dimakis, as Trustee of Evthokia Realty Trust

v.

City of Haverhill; Haverhill Stem, LLC; Pineau Projects, LLC; and The Westland Group LLC.

| LOCUS ADDRESS/DESCRIPTION | CITY/TOWN |
|---|---|

## PART I – TYPE OF ACTION

Using the list below, place the Number "1" next to the main cause of action asserted in your complaint.

Place an "X" next to each other cause of action asserted in your complaint.

Is this complaint verified? ☒ Yes ☐ No

Any related cases (open or closed) filed in the Land Court Department? ☐ Yes ☐ No

Case No(s). _____

| | | | | | | |
|---|---|---|---|---|---|---|
| | ZAC | Appeal from Zoning/Planning Board G. L. c. 40A, § 17 | | PAR | Partition G. L. c. 241 |
| | ZAD | Appeal from Planning Board G. L. c. 41, § 81BB | | RED | Redemption G. L. c. 60, § 76 |
| X | ZJA | Validity of Zoning G. L. cc. 240, § 14A, 185, § 1 (j ½) | | SP | Specific Performance of Contracts G. L. c. 185, § 1 (k) |
| | ZEN | Enforcement of Zoning G. L. c. 40A, § 7 | | MBF | Determine Municipal Boundaries G. L. c. 42, § 12 |
| | COT | Remove Cloud on Title G. L. c. 240, § 6 - 10 | | MFE | Determine Boundaries of Flats G. L. c. 240, § 19 |
| | DOM | Discharge of Old Mortgage G. L. c. 240, § 15 | | CNC | Certiorari G. L. c. 249, § 4 |
| | LVT | Affirm Tax Foreclosure - Land of Low Value G. L. c. 60, § 80B | | MAN | Mandamus G. L. c. 249, § 5 |
| | MTB | Try Title G. L. c. 240, § 1 - 5 | | TRE | Trespass to Real Estate Involving Title G. L. c. 185, § 1 (o) |
| | MWA | Recover Freehold Estate (Writ of Entry) G. L. c. 237 | X | EQA | Equitable Action Involving Any Right, Title or Interest in Land G. L. c. 185, § 1 (k) |
| | MRC | Determine Validity of Encumbrances G. L. c. 240, § 11 - 14 | | | |
| | CER | Enforce Restrictions G. L. c. 240, § 10A - 10C | | AHA | Affordable Housing Appeal G. L. c. 40B, § 21 |
| | MAD | Determine Fiduciary Authority G. L. c. 240, § 27 | 231A | OTA | Other |

| SIGNATURE OF SELF-REPRESENTED PLAINTIFF | DATE |
|---|---|

## PART II – UNIFORM COUNSEL CERTIFICATE (SJC RULE 1:18)

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

| SIGNATURE OF ATTORNEY | BBO NUMBER | DATE |
|---|---|---|
| | 695421 | May 30, 2019 |

COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS.

LAND COURT
LAND COURT DEPARTMENT FILED
OF THE TRIAL COURT
2019 MAY 30  PM 3: 56

|  |  |  |
|---|---|---|
| J. BRADFORD BROOKS and LLOYD JENNINGS, as TRUSTEES of the L&B REALTY TRUST; STAVROS DIMAKIS d/b/a Mark's Deli; and STAVROS DIMAKIS as TRUSTEE of EVTHOKIA REALTY TRUST | ) ) ) ) ) ) | Civil Action No. _____ |
| Vs. | ) ) |  |
| CITY OF HAVERHILL; HAVERHILL STEM, LLC; PINEAU PROJECTS, LLC and THE WESTLAND GROUP LLC. | ) ) ) ) ) ) |  |

## VERIFIED COMPLAINT UNDER M.G.L. c. 240, § 14A TO DETERMINE THE VALIDITY AND EXTENT OF MUNICIPAL ZONING ORDINANCES, BY-LAWS AND REGULATIONS; AND VERIFIED COMPLAINT UNDER M.G.L. c. 231A FOR DECLARATORY AND INJUNCTIVE RELIEF.

NOW COME THE PLAINTIFFS, L&B Realty Trust, by and through J. Bradford Brooks and Lloyd Jennings, its Trustees; Stavros Dimakis d/b/a Mark's Deli; and Stavros Dimakis as Trustee of the Evthokia Realty Trust, and who, having been duly sworn upon their oath as to the truthfulness of the facts contained herein to the best of their knowledge, information, and belief, do now depose and state, as and for their Verified Complaint against the above-named defendants:

### Jurisdiction & Venue

The Land Court (the "Court") has exclusive jurisdiction under M.G.L.c. 185, § 1 (j ½) as to complaints under M.G.L.c 240, § 14A to determine the validity and extent of municipal zoning ordinances, by-laws and regulations; it also has concurrent jurisdiction under M.G.L.c.

1

231A to make binding declarations of right, duty, status and other legal relations sought thereby, either before or after a breach or violation thereof has occurred, in any case in which an actual controversy has arisen and that is specifically set forth in the pleadings and whether any consequential judgment or relief is or could be claimed at law or in equity.

## The Parties

1.  Plaintiffs J. Bradford Brooks ("Brooks") and Lloyd Jennings ("Jennings"), as Trustees of L&B Realty Trust ("L&B"), is a Massachusetts nominee realty trust organized under the laws of the Commonwealth of Massachusetts, and having a principal place of business at 128-130 Washington Street, Haverhill, Essex County, Massachusetts 01832. At all times material hereto, L&B was the owner of the real property located at 128 – 130 Washington Street, Haverhill, Essex County, Massachusetts by deed dated May 31, 2017 recorded with Essex South Registry of Deeds in Book 35913, Page 105 ("L&B's Property"). L&B's Property is mixed-use comprising restaurants and residential tenants.

2.  The plaintiff Stavros Dimakis d/b/a Mark's Deli ("Mark's Deli") is a restaurant operation and has a principal place of business at 2 Railroad Square, Haverhill, Massachusetts 01832. At all times material hereto, Mark's Deli is the sole tenant of the real property located at 2 Railroad Square, Haverhill, Essex County, Massachusetts 01832 ("Mark's Deli's Property").

3.  The Plaintiff Stavros Dimakis as Trustee of the Evthokia Realty Trust ("Evthokia Trust") is a Massachusetts nominee realty trust with a principal place of business at 2 Railroad Square, Haverhill, Essex County, Haverhill, Massachusetts 01832-5522. Evthokia Trust is the owner of the real property at 2 Railroad Square, Haverhill, Essex County, Massachusetts 01832 and leases said property to Mark's Deli.

4.  Plaintiffs L&B, Mark's Deli, and Evthokia Trust are hereafter known collectively as "Plaintiffs".

5.  The defendant City of Haverhill, Massachusetts (the "City") is now, and at all times relevant to this action was, a municipal corporation duly organized and existing under the laws of the Commonwealth of Massachusetts, with the City Hall Clerk's Office located at 4 Summer Street, Haverhill, Essex County, Massachusetts 01830.

6.  The defendant Haverhill Stem, LLC. ("Stem" or "Defendant Stem") is a Massachusetts limited liability company organized on April 13, 2018 with a principal place of business at 25 Bradfields Drive, Haverhill, Essex County, Massachusetts 01830 and engages in the business of retail sale of recreational marijuana. Caroline Pineau is the sole manager thereof. At all times material hereto, Stem was the lessee of the premises located at 124 Washington Street, Haverhill, Essex County, Massachusetts 01832, which property abuts and is connected to and is between the properties owned by and under the control of L&B (the "Property"). Stem is in the business of growing, processing, distributing and selling marijuana and products derived from marijuana for recreational (and not medical) purposes. Stem knowingly leased the Property for the purpose of establishing and conducting a recreational (and not medical) marijuana business at that location, and knowingly receives proceeds therefrom.

7.  The defendant Pineau Projects, LLC ("Pineau") is a Massachusetts limited liability company with a place of business at 25 Bradfields Drive, Haverhill, Essex County, Massachusetts 01830, and upon information and belief is the management company for defendant Stem for such facility.

3

8. The defendant The Westland Group LLC ("Westland" or "defendant Westland") is a Massachusetts limited liability company with a principal place of business at 124 Washington Street, Haverhill, Essex County, Massachusetts 01832. At all times material hereto, Westland was the owner of the real property located at 124 Washington Street, Haverhill, Essex County, Massachusetts 01832 which was leased to the defendant Stem for the purpose of establishing and conducting a recreational marijuana business at that location, and Westland knowingly receives proceeds therefrom.

### The Facts

9. As reported by the Eagle Tribune, on and between December 12 – 28, 2018, the City of Haverhill finalized host agreements with three recreational marijuana retailers. However, the agreement executed with Stem was fundamentally different than the two other host agreements in that it included a "most favored nations" contractual clause, stating in effect that should another marijuana establishment sign an agreement that it will pay a lesser percentage of profits generated from retail recreational marijuana profits to the City of Haverhill, then the Stem host agreement will be renegotiated to match any more favorable deal.

10. On January 15, 2019, the City Council of the City of Haverhill duly enacted and adopted **Chapter 255** as a zoning Ordinance entitled "An Ordinance Relating to Adult Use of Marijuana and Marijuana Establishment" by deleting Article XIX in its entirety and inserting a new Article XIX. An attested copy of Chapter 255 is attached hereto as **Exhibit A** and is incorporated herein by reference. (the "Ordinance"). Said Ordinance divided the City of Haverhill into two districts designated respectively as (i) the Waterfront District Area and (ii) Outside the Waterfront District Area, including certain

maps showing the boundaries of such districts, and providing regulations as to the permissible uses of property and structures in such districts, including the use of recreational retail marijuana establishments under the control of the Massachusetts Cannabis Control Commission ("CCC").

Under **Article XIX paragraph A(2)**, one of the purposes of the Ordinance was:

> To minimize any adverse impacts of adult use marijuana establishments on adjacent properties, dense or concentrated residential areas, schools and other places children congregate, and other sensitive land uses.

11. Under **Article XIX D(2) and (3)** of the Ordinance it was provided as follows:

> 2. *Buffer Zone:* NO LME outside the Waterfront District Area (WDA) shall be located within <u>500 feet</u> of the following pre-existing structures or uses: any school attended by children under the age of 18, licensed childcare facility, **municipally owned and operated park or recreational facilities** ..., churches or places of worship, libraries, playground or play field, **Or youth center**. (emphasis added)

> 3. *Notification:* Applicants seeking to establish an LME within the Waterfront District Area (WDA) must notify adjacent property owners, as well as any pre-existing licensed childcare facility for children under the age of 18, church or place of worship, or youth center, within 300 feet of the proposed site of the initial application for a special permit.

12. The Ordinance under **Article XIX (A) 1** stated in part that the purpose was "To Provide for the placement of adult use marijuana establishments in appropriate paces and under specific conditions in **accordance with the provisions of Massachusetts General Law Chapter 94G, Regulation of the Use and Distribution of Marijuana Not Medically Prescribed.**" (emphasis added).

13. Pursuant to **M.G.L.c. 94G, § 5 (3)** it is provided as follows:

> (3) the property where the proposed marijuana establishment is to be located at the time the license application is received by the commission is not located within 500 feet of a pre-existing public or private school providing education in kindergarten or any of grades 1 through 12, unless a city or town adopts an ordinance or by-law that reduces the distance requirement.

14. At the time the above-mentioned Ordinance was enacted, the City Council of the City of Haverhill had no evidence before it that justified the zoning change, or showed it would substantially further the public health, safety, and welfare of the City of Haverhill and its inhabitants, or any of the other purposes declared in the zoning by-laws of the City of Haverhill.

15. At no time subsequent to the enactment of the Ordinance has there been any change of the above-described conditions in or near the neighborhood of the above-mentioned properties or anywhere in the above-mentioned district that warranted the above-mentioned zoning change. In enacting the above-mentioned Ordinance, the City Council of the City of Haverhill heard no evidence regarding, and gave no consideration whatsoever to the character of the district and its suitability for the particular uses permitted under a Waterfront Zone classification, or to conserving the value and most appropriate use of land in the district and throughout the City of Haverhill.

16. The above-mentioned Ordinance to permit Stem's proposed retail recreational marijuana commercial use of the Property will arbitrarily and unreasonably change the existing character of the neighborhood by increasing congestion in the streets, causing an overcrowding of land, diminishing the adequate provision of transportation, endangering children at nearby schools and frequent patrons at Mark's Diner, endangering children who visit and frequently use the multiple public parks within five hundred feet of the Property, cause disturbing noises incident to increased traffic and marijuana business operations, noxious smells, and destroying the attractive surroundings created by the residential nature of the existing district with a stigmatized marijuana use; all of which

6

will destroy the desirability and value of the property in the district, including plaintiffs' properties.

17. On or about early Spring 2019, the defendant Stem applied for a special permit from the City of Haverhill for the operation of a retail recreational marijuana establishment at the property, which is located in the Waterfront District Area in Haverhill.   A hearing has been scheduled on that application for June 18, 2019 at approximately 7:00 PM before the City Council for the City of Haverhill.

18. Upon information and belief, the Property and the proposed marijuana establishment of Stem are within 500 feet or less of a new location of The Wild Flower School (a network of Montessori elementary schools)("Montessori School"). Upon information and belief, the Montessori School has entered into progressed negotiations (starting in or about 2017) with the Coalition for a Better Acre, Inc. ("CFABA"), the landlord of 181-214 Washington Street, Haverhill, Essex County, Massachusetts 01832 (the "Gerson Building"), for the Montessori School to operate out of the Gerson Building upon its construction completion. Based on a preliminary Memorandum of Understanding dated September 2018, The Montessori School would occupy 2,654 square feet of street-level commercial space located in the Gerson Building, for use as a "preschool educational facility for children" for an initial lease term of five (5) years with options to renew to be negotiated.

19. The Property is also within 500 feet or less of the Riverfront Park (City of Haverhill Parcel ID# 309-1-9a).

20. The Property is also within 1000 feet or less of the Walter A. Wysocki Park (City of Haverhill Parcel ID# 514-287-1).

21. The Property is also within 500 feet or less from a public or municipal park and/or playground located behind the Property parking lot by the body of water.

22. Upon information and belief, the Property is also located within 1000 feet of the Boys & Girls Club of Greater Haverhill located at 55 Emerson Street, Haverhill, Massachusetts 01830.

23. L&B rents to residential tenants with children under the age of 18 years old in Unit B of 128-130 Washington Street, Haverhill, Essex County, Massachusetts.

24. Mark's Deli, on a daily basis, has more than ½ of its patrons being children under the age of 18 years old.

25. The Hidden Pig Restaurant, a tenant of L&B, on a daily basis, has more than ½ of its patrons being children under the age of 18 years old and have expressed concerns to L&B as their landlord about a recreational marijuana establishment operating next door.

26. State and Federal Courts measure distances for zoning and criminal violations "as the crow flies". *See e.g., Bedford v. Trustees of Boston University*, 25 Mass.App.Ct. 372 (1988); See *People v. Robbins*, 5 NY3d 556 (2005, Kaye, Ch.J.). Courts have rejected the argument that the distance should be measured along the path that a car or pedestrian would take to get to the school or playground or park. *See U.S. v. Watson*, 887 F.2d 980 (9th Cir. 1989); *United States v. Ofarril*, 779 F.2d 791 (2d Cir. 1985)(per curiam), cert. denied, 475 U.S. 1029 (1986).

27. Federal law is clear: it is a felony under the Controlled Substances act of 1970 ("CSA") to manufacture, distribute, or dispense or possess with intent to manufacture, distribute, or dispense, a controlled substance. 21 U.S.C. § 841(a)(1). The CSA divides controlled substances into five "schedules." At all times relevant to this complaint, marijuana has

been listed (and currently remains listed as of the filing of this Complaint) under the CSA as a Schedule I controlled substance. Schedule I controlled substances are drugs that have no currently accepted medical use and a high potential for abuse. 21 U.S.C. § 812(b)(1).

28. Notwithstanding that in some circumstances the possession and sale of marijuana no longer violates *Massachusetts* law, the drug's manufacture, possession and distribution remain serous federal criminal offenses under federal law. The CSA imposes severe fines and extended prison terms for violations. 21 U.S.C. § 841(b). The Supreme Court has upheld the federal government's authority to criminalize marijuana, even in the face of contrary state law. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 489-95 (2001)(holding that medical necessity is not a defense to the Controlled Substances Act); *Gonzales v. Raich*, 541 U.S. 1, 23-33 (2005)(holding that the federal government's Commerce Clause power is broad enough to criminalize the cultivation of a small amount of medicinal marijuana for personal use). Congress has not amended to date the CSA to make it legal to manufacture, distribute, or dispense marijuana.

29. The exercise of prosecutorial discretion by the United States Department of Justice ("DOJ") regarding certain medical-marijuana businesses operating in compliance with state law has no impact upon the rights and remedies afforded Plaintiffs in this action.

30. While the DOJ has exercised prosecutorial discretion in certain circumstances, it has not granted immunity from prosecution to any medical or recreational marijuana business on the basis that the business complies with state law, and especially has not done so for any recreational marijuana business. To the contrary, the DOJ has reserved all of its rights to prosecute violations of the CSA.

31. John F. Walsh, the United States Attorney for the District of Colorado pursued more than twenty (20) enforcement actions in 2012 against marijuana dispensaries operating within 1,000 feet of schools. As a result of these enforcement actions, the dispensaries involved closed. *See* **Exhibit B** and **Exhibit C** attached hereto and incorporated herein by reference.

32. On January 4, 2018, U.S. Attorney General Jefferson B. Sessions III issued a Memorandum for All United States Attorneys with the subject heading "Marijuana Enforcement." That memorandum specifically rescinded all prior guidance and safe harbor provisions concerning marijuana, stating that "[Congress] has established significant penalties for [CSA violation] crimes. 21 U.S.C. § 841 et seq. These activities may also serve as the basis for the prosecution of other crimes, such as those prohibited by the money laundering statutes. These statutes reflect Congress's determination that marijuana is a dangerous drug and that marijuana activity is a serious crime." *See* **Exhibit D** attached hereto. David W. Ogden, Deputy Att'y Gen., Memorandum for Selected United States Attorneys: Investigations and Prosecutions in States Authorizing the Medical Use of Marijuana (Oct. 19, 2009); James M. Cole, Deputy Att'y Gen., Memorandum for United States Attorneys: Guidance Regarding The Ogden Memo in Jurisdictions Seeking to Authorize Marijuana for Medical Use (June 29, 2011); James M. Cole, Deputy Att'y Gen., Memorandum for All United States Attorneys: Guidance Regarding Marijuana Related Financial Crimes (Feb. 14, 2014); and Monty Wilkinson, Director of the Executive Office for U.S. Att'ys, Policy Statement Regarding Marijuana Issues in Indian Country (Oct. 28, 2014). The Justice Department continues to pursue the forfeiture of real property housing several marijuana dispensaries in the San Francisco,

10

California area. *See, e.g., City of Oakland v. Lynch*, 798 F.3d 1159 (9th Cir. 2015); *U.S. v. One Parcel of Property Located at 5 Reynolds Lane*, Waterford, Conn., 909 F.Supp.2d 131 (D.Conn. 2012)(mortgage interest in seized property held inferior to the government's forfeiture right in seizing property used to grow marijuana).

33. On July 10, 2018, Andrew Lelling, US Attorney for the District of Massachusetts, issued a statement that "Marijuana distribution…remains illegal; it is specifically prohibited by federal law. Because I have a constitutional obligation to enforce the laws passed by Congress, I will not effectively immunize the residents of the Commonwealth from federal marijuana enforcement." *See* **Exhibit E** attached hereto and incorporated herein by reference. *Statement from U.S. Attorney Andrew Lellling Regarding the Legalization of Recreational Marijuana in Massachusetts* (July 10, 2018, accessed May 28, 2019), https://www.justice.gov/usao-ma/pr/statement-us-attorney-andrew-lelling-regarding-legalization-recreational-marijuana.

34. Westland has knowingly leased the Property for the purpose of distributing marijuana, a Schedule I controlled substance.

35. Stem and Pineau has knowingly rented and maintained the Property for the purpose of distributing marijuana, a Schedule I controlled substance.

36. Westland manages and controls the Property as an owner and agent, and knowingly and intentionally rents, leases, profits from, and makes the Property available for use for the purpose of unlawfully storing and distributing marijuana.

37. 21 U.S.C. § 860 (a), provides as follows:

Any person who violates section 841(a)(1) of this title or section 856 of this title by distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of, the real property comprising a public or

private elementary, vocational, or secondary school or a public or private college, junior college, or university, **or a playground**, or housing facility owned by a public housing authority, or within 100 feet of a public or private youth center, public swimming pool, or video arcade facility, is (except as provided in subsection (b)) is subject to (1) twice the maximum punishment authorized by section 841(b) of this title; and (2) at least twice any term of supervised release authorized by section 841(b) of this title for a first offense. A fine up to twice that authorized by section 841(b) of this title may be imposed in addition to any term of imprisonment authorized by this subsection. Except to the extent a greater minimum sentence is otherwise provided by section 841(b) of this title, a person shall be sentenced under this subsection to a term of imprisonment of not less than one year. The mandatory minimum sentencing provisions of this paragraph shall not apply to offenses involving 5 grams or less of marihuana. (emphasis added).

38. It has been held that the statute prohibiting possession of drugs with intent to distribute within 1000 feet of <u>school</u> did not require finding by jury that the defendant actually distributed, attempted to distribute, or intended to distribute drugs within 1,000 feet of school, but only that defendant possessed illegal drugs within 1,000 feet of school and intended to distribute them somewhere. *U.S. v. Irwin*, 439 F.Supp.2d 954. (D. North Dakota, Southwestern Division 2006).

39. As to **playgrounds/parks**, it has been held that for purposes of statute doubling potential punishment for defendants who distribute drugs or possess drugs with intent to distribute near a playground, jury could infer from the mere fact that the real estate was called a "park" that it met the first three parts of the statutory definition: that it was an outdoor facility; that it was intended for recreation; and that it was open to the public. *U.S. v. Parker*, 30 F.3d 542 (4th Cir. 1994), *certiorari denied*, 513 U.S. 1029.

40. 21 U.S.C § 843(b)-(c) makes it a federal criminal offense to use a communication facility to further the manufacture and sale of marijuana.

41. The communications facilities used by Stem include, but are not limited to, its website https://stemhaverhill.com/ and the following social media websites:

(a) https://gardenremedies.com/news/2019/5/15/yahoo-finance

(b) https://www.linkedin.com/in/caroline-pineau-57b5229/

42. Stem uses its website to facilitate the distribution of marijuana at the Property in violation of 21 U.S.C. 843(b) by allowing customers to sign up to be notified of information about the store opening.

43. Stem and its owner/manager Caroline Pineau use the internet to communicate about the property and conduct normal business operations of the recreational marijuana retail facility.

44. Each separate use of the internet by Stem to advertise its business, purchase equipment, enter into lease arrangements, knowing and intending that such items will be used to sell and/or manufacture marijuana constitute a separate act of illegal activity under 18 U.S.C. § 843(b).

45. Caroline Pineau also uses communications facilities in committing, causing and facilitating the commission of acts constituting felonies under Subchapters I and II of Chapter 13 of Title 1. These communications include use of the mail, telephone, and internet.

## COUNT ONE (M.G.L.c. 240, § 14A)

46. Plaintiffs repeat, reallege and incorporate by reference paragraphs 1 – 42 above as though fully set forth herein.

47. Under M.G.L. c. 240, § 14A it "shall not be open to objection" that a mere judgment, order or decree is sought as to the validity of a municipal ordinance or by law" and that the right to file an action seeking a judicial determination of the validity of a municipal

13

ordinance or by law where no permit or license has been granted is not an objection to such a petition.

48. Under M.G.L.c. 240, § 14A it is provided that "The court may make binding determinations of right interpreting such ordinances, by laws or regulations whether any consequential judgment or relief is or could be claimed or not."

49. (a)      As to M.G.L.c. 94G, § 5 (3), it appears that the Ordinance is consistent with the intended establishment of a buffer zone for public or private schools for grades 1-12, but that the Ordinance added a buffer zone for other uses including "municipally owned and operated park or recreational facilities" and also a "playground or play field" with no age limitation thereto.  However, the Ordinance appears to limit the 500 foot buffer zone to an LME "outside the Waterfront District Area" whereas M.G.L.c. 94G, § 5 (3), had no such limitation, but merely an exception allowing a city or town to "reduce the distance requirement."

No language in the ordinance expressly states that the buffer zone for the Waterfront District Area is eliminated, and *a fortiori*, Article XIX (D)(3) is entitled "**Notification**" merely requiring an applicant seeking to establish an LME within the Waterfront District Area to notify adjacent property owners and pre-existing licensed childcare facilities, churches, and youth center within 300 feet of the proposed site. However, if the purpose of the buffer zone was to eliminate the buffer zone requirement for the Waterfront District Area, which is unclear and not certain from a plain reading of the ordinance, the word "**reduce**" in the exception under M.G.L.c. 94G, § 5 (3) does not mean eliminate. *See* The New Lexicon Webster's Dictionary: the word "reduce" means "to make smaller in size or less in size…" It does not mean to eliminate entirely.

14

Since it appears from both the statute and the Ordinance that a key purpose was to have a buffer zone for schools—and in the case of the Ordinance—broadening that protection to include adjacent properties, dense or concentrated residential areas, other places where children congregate and "other sensitive land uses"—any claimed elimination of a buffer zone for the Waterfront District Area is and would be anathema to those purposes. There is no legitimate purpose for the elimination of any protection of children—or for that manner to any protected class of individuals intended to be protected under an applicable ordinance. If the Waterfront District Area were eliminated from any buffer zone requirements, that elimination is and would be contrary to the express language of M.G.L.c. 94G, § 5 (3) and the intended purpose of having a buffer zone for the protection of children.

(b)     Assuming *arguendo* that the Ordinance eliminated the Waterfront District Area from any buffer zone requirements, the singling out of the Waterfront District Area constituted **spot zoning or illegal zoning**. Such differential treatment from that accorded to similar surrounding properties without any rational planning objective, mainly failing to treat like properties in a uniform manner, is violative of the intent of the City of Haverhill zoning by-laws and general zoning principles to which all Massachusetts' bodies politic must adhere. In addition, special treatment resulting in economic benefit to the LME applicant is contrary to the concept of equal protection under the law. If, as, and when a buffer zone was instituted, it is intended to protect children from marijuana establishments (i.e. LME's); there is no legitimate purpose in denying that protection to children in the Waterfront District Area (especially the children who frequent Mark's Deli and L&B properties. Such protection shall be applied to all

other areas in the City of Haverhill, especially where <u>all</u> children are entitled to equal protection under the law.

(c)    Both the Ordinance and statute also <u>conflict with federal law</u> as to the required buffer zone for places where children congregate (i.e. schools, parks, playgrounds, etc.) from marijuana which is listed as a Schedule I substance under the CSA.  Federal statutes and federal agency action promulgated through formal rulemaking have preemptive effect over inconsistent state law. *Wyeth v. Levine*, 555 U.S. 555, 576 (2009); *see also Algonquin LNG v. Loqa*, 79 F. Supp. 2d 49 (D.R.I. 2009) (Providence zoning ordinance preempted by the Natural Gas Act, 15 U.S.C. § 717 et seq., and Natural Gas Pipeline Safety Act, 49 U.S.C. § 60101 et seq., to the extent the ordinance prevented a modification to a liquid natural gas facility that had been approved by the Federal Energy Regulatory Commission); *cf. Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) (holding that the Federal Cigarette Labeling and Advertising Act preempted zoning-like regulations of the attorney general that specifically targeted cigarette advertising in a way that effectively banned them, but noting that "generally applicable zoning restrictions" that treated cigarette advertising equally with other advertising would not be preempted).

(d)    Chapter 255, Article XVII entitled "Medical Marijuana Overlay District" prescribes that an Registered Marijuana Dispensary ("RMD") (i.e. a medical marijuana establishment) may not be located within 500 linear feet of schools and other child-centric locations with the distance requirement capable of being reduced by 25% or less, if certain requirements are met as delineated at § 255-178, Part (c) "Location". Again, in the medical marijuana context, the reduction appears to reduce the buffer zone by 25% or less, but does not eliminate said buffer zone entirely. A 25% reduction to the 500 foot buffer zone would reduce said buffer zone by 125 feet, meaning said buffer zone could be lowered to 375 feet. Since an

RMD permits sales of marijuana only to those who have obtained a registration card (i.e. medical patients), as opposed to recreational marijuana LMEs, which does not require any registration card for patrons, one could easily infer that sales in an RMD would be to a significantly smaller population and only to those in need of medical marijuana—as opposed to recreational pot—which is open and advertised to a larger amount of people and with no medical purpose. One would assume that there would be greater restrictions on recreational marijuana sales than for medical marijuana sales. Moreover, the ordinance for RMDs does not eliminate (or exclude) the Waterfront District, or reduce the buffer zone down to zero. The difference in treatment for zoning purposes of medical marijuana vs. recreational marijuana are illogical, illegal, and have no legal justification.

## COUNT TWO (M.G.L.c. 231A) AND REQUEST FOR EQUITABLE RELIEF

50. Plaintiffs repeat, reallege and incorporate herein paragraphs 1 – 46 above as though separately set forth herein.

51. Pursuant to M.G.L.c. 231A, § 1, the Land Court "may on appropriate proceedings make binding declarations of right, duty, status and other legal relations sought thereby, either before or after a breach or violation thereof has occurred in any case in which an actual controversy has arisen," The plaintiffs seeking a binding declaration of the rights of the parties hereto, including, but not limited to the validity of the ordinance and whether it constitutes spot or illegal zoning and whether it is in conflict with federal law and been superseded by federal law.

52. Plaintiffs further seek equitable relief against the defendants from proceeding with the special permit and any granting thereof unless and until the issues and objection thereto

as set forth in this complaint are adjudicated which are and would be necessary prior to any hearing on the merit by the City of Haverhill as to the granting of a special permit.

53. All parties have been joined who are or may be necessary for a complete adjudication of the rights and obligations of the parties hereto.

54. For the reasons set forth above, the above-mentioned Ordinance is unconstitutional, illegal, null, and void in that it constitutes an instance of arbitrary and unreasonable spot zoning bearing no substantial relationship to the public health, safety, and welfare of the City of Haverhill and its inhabitants, but, contrary to the provisions of zoning by-laws of the City of Haverhill, is detrimental to the City of Haverhill and its inhabitants, especially children under the age of eighteen (18) years old, is in violation of state and federal narcotics laws, and has no effect other than to confer a special privilege furthering the private interests of the defendants, especially Stem, while depriving plaintiffs and other property owners in the neighborhood of their rights, values, and privileges in and to their properties.

55. For the reasons set forth above, an actual controversy has arisen between plaintiffs and defendants regarding their respective rights and duties under the above-mentioned ordinances of the City of Haverhill, subjecting plaintiffs to the risk of irreparable injury unless granted the relief sought in this complaint, for which they have no adequate legal remedy.

56. The above-mentioned Ordinance is unconstitutional, null, and void as applied to plaintiff's property, for the following reasons:

    (a) The Ordinance constitutes an unreasonable, arbitrary, and discriminatory spot zoning of the district on which plaintiff's property is located, having no relation

whatever to the public health, safety, and welfare, and it thereby deprives plaintiff

of the equal protection of the laws.

(b) By such arbitrary spot zoning, the Ordinance violates the spirit and intent of the

City of Haverhill zoning by-laws, authorizing defendant City of Haverhill to

adopt zoning regulations solely for the purpose of revenue generation for the City

of Haverhill, and to enrich Caroline Pineau, and her operating entities Stem and

Pineau Projects, LLC, and it thereby deprives plaintiffs of their property without

due process of law.

(c) By reducing the value of plaintiffs' property, the Ordinance constitutes a public

taking of the property without just compensation.

## PRAYERS FOR RELIEF

**WHEREFORE**, the Plaintiffs request the following relief:

1.  That pursuant to M.G.L.c. 240, § 14A and M.G.L.c. 231A, § 1 this Court issues binding

    determinations of rights and declarations of rights interpreting such ordinances, by laws

    or regulations including, but not limited to their validity and interpretations thereof and in

    particular and without limitation as to whether such ordinance is valid despite being

    contrary to M.G.L.c. 94G, § 5 (3), whether such ordinance constitutes spot zoning or

    illegal zoning, and whether such ordinance violates Federal law and is superseded by

    Federal law.

2.  That the Court issue a Declaration declaring the above-mentioned Ordinance

    unconstitutional, null, and void as applied to the Property;

19

3. Permanently enjoining defendants, and all persons acting under defendants and their successors in office, from enforcing or attempting to enforce the above-mentioned Ordinance in the manner set forth in this complaint;

4. That the Court issue a short order of notice to the defendants to show cause as to why a preliminary injunction should not issue against the defendants, their agents, servants and attorneys from proceeding with the special permit of the applicant Haverhill Stem, LLC and any granting thereof unless and until the issues and objection thereto as set forth in this complaint are adjudicated which are and would be necessary prior to any hearing on the merit by the City of Haverhill as to the special permit until the further Order of the Court, and continuing said stay until such time as the Court can conduct a full Trial on the merits or Declaratory Judgment of the Court.

5. Awarding Plaintiffs their reasonable attorney's fees and costs of suit;

6. For such other and further relief and declarations or determinations as may be just and proper.

<u>**SIGNATURES AND VERIFICATIONS ON NEXT PAGE**</u>

20

Dated: May 30th, 2019

PLAINTIFFS',

By their Attorneys,

*[signature]*

Scott A. Schlager, BBO# 695421
Alvin S. Nathanson, BBO# 367480
Nathanson & Goldberg, P.C.
Two Atlantic Avenue, Fifth Floor
Boston, Massachusetts 02110
Tel. (617) 210-4800
Fax. (617) 210-4824
sas@natgolaw.com
asn@natgolaw.com

## VERIFICATION

We, J. Bradford Brooks and Lloyd Jennings, in our official capacities as Trustees of the L&B Realty Trust, having been first duly sworn upon our oath, do hereby state that we have read the foregoing Complaint and each of the 48 numbered paragraphs, above, line-by-line, and that the facts contained therein are true and correct and/or reasonably believed by us to be true after diligent and reasonable inquiry.

*SUBSCRIBED AND SWORN TO UNDER THE PAINS AND PENALTIES OF PERJURY THIS 30th DAY OF MAY, 2019:*

J. BRADFORD BROOKS and LLOYD JENNINGS,
as TRUSTEES of the  L&B REALTY TRUST.


_____
J. Bradford Brooks, Trustee, Duly Authorized


_____
Lloyd Jennings, Trustee, Duly Authorized

21

COMMONWEALTH OF MASSACHUSETTS

Essex, SS                                      May  30th, 2019

    Then personally appeared before me the above named J. Bradford Brooks, trustee of the

L&B Realty Trust, and after the presentation to me of suitable identification, namely, a

Massachusetts driver's license, did make oath that the above statements are true, excepting those

made upon information and belief, and as to those he or they believes them to be true, and that

no material facts have been omitted therefrom.




Notary Public

My commission expires: June 1, 2023

COMMONWEALTH OF MASSACHUSETTS

Essex, SS                                      May  30th, 2019

    Then personally appeared before me the above named Lloyd Jennings, trustee of the

L&B Realty Trust, and after the presentation to me of suitable identification, namely, a

Massachusetts driver's license, did make oath that the above statements are true, excepting those

made upon information and belief, and as to those he or they believes them to be true, and that

no material facts have been omitted therefrom.

Notary Public

My commission expires: June 1, 2023

22

## VERIFICATION

I, **Stavros Dimakis, d/b/a Mark's Deli,** and **Stavros Dimakis, Trustee of the Evthokia Realty Trust,** having been first duly sworn upon our oath, do hereby state that we have read the foregoing Complaint and each of the 48 numbered paragraphs, above, line-by-line, and that the facts contained therein are true and correct and/or reasonably believed by us to be true after diligent and reasonable inquiry.

_____
Stavros Dimakis d/b/a Mark's Deli


_____
Stavros Dimakis, Trustee, Evthokia Realty Trust
Duly Authorized

*SUBSCRIBED AND SWORN TO UNDER THE PAINS AND PENALTIES OF PERJURY THIS 30th DAY OF MAY, 2019:*


COMMONWEALTH OF MASSACHUSETTS

Essex, SS                                  May  30th, 2019

Then personally appeared before me the above named Stavros Dimakis d/b/a Mark's Deli, and after the presentation to me of suitable identification, namely, a Massachusetts driver's license, did make oath that the above statements are true, excepting those made upon information and belief, and as to those he or they believes them to be true, and that no material facts have been omitted therefrom.

SCOTT A. SCHLAGER
Notary Public
Massachusetts
Commission Expires Jun 1, 2023

_____
Notary Public

My commission expires: June 1, 2023

23

# EXHIBIT A



DOCUMENT 103-BB

MAR 2 0 2019

# CITY OF HAVERHILL

In Municipal Council   January 15, 2019

ORDERED:

True Attest Copy
Linda L. Koutoulas

MUNICIPAL ORDINANCE                                    CHAPTER 255

## AN ORDINANCE RELATING TO ADULT USE
## OF MARIJUANA AND MARIJUANA ESTABLISHMENTS

IT ORDAINED by the City Council of the City of Haverhill that Chapter 255, of the Code of the City of Haverhill, as amended, being and is hereby further amended by deleting Article XIX in its entirety and inserting in its place the following:

Article XIX – Licensed Marijuana Establishments Overlay Zone

A. Purposes.

   1. To provide for the placement of adult use marijuana establishments in appropriate places and under specific conditions in accordance with the provisions of Massachusetts General Law Chapter 94G, Regulation of the Use and Distribution of Marijuana Not Medically Prescribed.

   2. To minimize any adverse impacts of adult use marijuana establishments on adjacent properties, dense or concentrated residential areas, school and other places where children congregate, and other sensitive land uses.

   3. To regulate the siting, design, placement, access, security, safety, monitoring, modification and discontinuance of adult use marijuana establishments.

   4. To provide applicants, owners and operators with clear guidance regarding adult use marijuana establishments siting, design, placement, access, security, safety, monitoring, modification and discontinuance.

B. Definitions.

   1. Craft Marijuana Cooperative: A marijuana cultivator comprised of residents of the commonwealth organized as a limited liability company or limited liability partnership under the laws of the commonwealth, or an appropriate business structure

as determined by the Cannabis Control Commission, and that is licensed to cultivate, obtain, manufacture, process package and brand marijuana and marijuana products to deliver marijuana or Marijuana Establishments but not to consumers.

2. Independent Testing Laboratory: A laboratory that is licensed by the commission and is: (i) accredited to the most current International Organization for Standardization 17025 by a third-party accrediting body that is a signatory to the International Laboratory Accreditation Accrediting Cooperation mutual recognition arrangement or that is otherwise approved by the commission; (ii) independent financially from any medical marijuana treatment center or any license or marijuana establishment for which it conducts a test; and (iii) qualified to test marijuana in compliance with 935 CMR 500.160 and M.G.L. c.94C, S34.

3. Licensed Marijuana Establishment (LME): A marijuana cultivator, testing laboratory, marijuana product manufacturer, marijuana retailer, or any other type of licensed marijuana-related business.

4. Marijuana Cultivator: An entity licensed to cultivate, process, and package marijuana; to deliver marijuana to marijuana establishments; and to transfer marijuana to other marijuana establishments but not consumers.

5. Marijuana Product Manufacturer: An entity licensed to obtain, manufacture, process, and package marijuana and marijuana products; to deliver marijuana and marijuana products to marijuana establishments, and to transfer marijuana and marijuana products to other marijuana establishments but not consumers.

6. Marijuana Micro-Business: A marijuana establishment that is licensed to act as a: licensed marijuana cultivator in an area less than 5,000 square feet; licensed marijuana product manufacturer, and licensed marijuana delivery service in compliance with the operating procedures for each such license.

7. Marijuana Products: Products that have been manufactured and contain marijuana or an extract from marijuana, including concentrated forms or marijuana and products composed of marijuana and other ingredients that are intended for use or consumption, including edible products, beverages, topical products, ointments, oils and tinctures.

8. Marijuana Research Facility: An entity licensed to engage in research projects by the Cannabis Control Commission.

9. Marijuana Retailer: An entity licensed to purchase and deliver marijuana and marijuana products from marijuana establishments and to deliver, sell, or otherwise transfer marijuana and marijuana products to marijuana establishments and to

consumers. Marijuana retailers may be in the form of a storefront or a social consumption establishment.

10. <u>Social Consumption Establishment:</u> A marijuana retailer licensed to purchase marijuana and marijuana products from marijuana establishments and to sell marijuana and marijuana products on its premises only to consumers or allow consumers to consume marijuana and marijuana products on its premises only.

## C. Applicability.

1. No adult use marijuana establishment shall be permitted except in compliance with the provisions of this section.
2. If any provision of this section or the application of any such provision to any person or circumstance shall be held invalid, the remainder of this section, to the extent it can be given effect, or the application of those provisions to persons or circumstances other than those to which it is held invalid, shall not be affected thereby, and to this end the provisions of this section are severable.

## D. Designated Locations of Marijuana Establishments.

1. *Eligible Zones:* Certain groups of LME's shall be eligible for different zoning areas designated in the attached City Engineer's Map entitled "Licensed Marijuana Establishments Overlay Zone with Street Index" dated December 7, 2018, and as amended from time to time. This map is hereby made a part of the Zoning Ordinance and is on file in the office of the City Clerk. Those zones shall be as follows:

| District Full Name | Short Name |
|---|---|
| Licensed Marijuana Establishments – No Exclusions | LME-NE |
| Licensed Marijuana Establishments – No Retail Sales | LME-NR |
| Licensed Marijuana Establishments – Retail Sales Only | LME-RO |
| Medical Marijuana Overlay District – No Exclusions | MMOD |

2. *Buffer Zone:* No LME outside the Waterfront District Area (WDA) shall be located within 500 feet of the following pre-existing structures or uses: any school attended by children under the age of 18, licensed childcare facility, municipally owned and operated park or recreational facilities (not including bikeways, boardwalks, pedestrian paths, or other facilities primarily used for non-vehicular modes of travel), churches or places of worship, libraries, playground or play field, or youth center.
3. *Notification:* Applicants seeking to establish an LME within the Waterfront District Area (WDA) must notify adjacent property owners, as well as any pre-existing licensed childcare facility for children under the age of 18, church or place of worship, or youth center, within 300 feet of the proposed site of the initial application for a special permit.



4. No LME shall be located within on-half (1/2) mile of another licensed LME. The City Council may modify or waive this requirement.

E. **Designated Number of Marijuana Establishments.**

1. The total number of all Marijuana Retailers or Social Consumption Establishments may not exceed twenty (20%) of the number of licensed package and liquor stores within the City.
2. In the event that the number of licensed packaged liquor stores within the City decreases, an Marijuana Retailer or Social Consumption Establishment, if then exceeding twenty (20%) as noted in Subsection E,1 may remain in operation.
3. There shall be no restrictions on the number of any particular type of establishment permitted within the City, other than as regulated in Subsection E,1.

F. **Special Permit Required.**

1. No LME shall be operated or expanded without first obtaining a Special Permit from the City of Haverhill Special Permit Granting Authority in accordance with Chapter 255-80.
   a. The Special Permit Granting Authority for any LME shall be the City Council.
   b. A special permit shall only be valid for use by the Applicant and will become null and void upon the sale or transfer of the license of a LME or change in the location of the business.
   c. In the event that the Commonwealth's licensing authority suspends the license or registration of a marijuana establishment, the Special Permit shall be so suspended by the City until the matter is resolved to the satisfaction of said licensing authority.
   d. The special permit shall be considered null and void if meaningful construction and operation has not begun on within 1 year of obtaining said permit, as determined by the Building Inspector.

G. **Site Plan Review.**

1. Applications to operate or expand an LME shall be subjected to Site Review in accordance with the City of Haverhill Code, Chapter 255-68. The Site Plan shall be submitted in conjunction with the Special Permit application and joined to the final approval for the Special Permit.

H. **General Requirements.**

1. *Outside Storage*: No outside storage of marijuana, marijuana products, related supplies, or educational materials is permitted.

2. *Visibility of activities:* All activities of any LME shall be conducted indoors.

3. *Paraphernalia:* Devices, contrivances, instruments, and paraphernalia for inhaling or otherwise consuming marijuana, including, but not limited to, rolling papers and related tools, water pipes, and vaporizers may be lawfully sold at a marijuana retailer. No retail marijuana, marijuana products, or paraphernalia shall be displayed or kept in a retail marijuana store so as to be visible from outside of the license premises.

4. *Hours of Operation:* In no event shall marijuana retailers, social consumption establishments, or microbusinesses be open and/or operating and dispensing product between the hours of 9:00pm and 9:00am and not opening before 12:00pm/noon on Sundays.

5. *On-Site Consumption of Marijuana:* The use, consumption, ingestion or inhalation of marijuana or marijuana products shall only be permitted at social consumption establishments and research facilities, within the confines of the building. On-site consumption is prohibited on or within the premises of any other LME.

6. *Sale of Alcohol:* LME's are prohibited from selling alcoholic beverages.

I. **Design Requirements.**

1. The following are required for all proposed operations of an LME, consistent with Subsection D:

   a. *Permanent Location:* Each LME and any part of its operation, including but not limited to, cultivation, processing, packaging, and sales, shall be operated from a fixed location within a fully enclosed building. No marijuana establishment shall be permitted to operate from a moveable, mobile, or transitory location.

   b. *Lighting:* Outdoor light levels shall exceed one (1) foot-candle along property lines, nor ten (10) foot-candles for any location on the property. Any light poles, new or existing, may not exceed eighteen (18) feet in overall height. All outdoor light fixtures must be shielded and aimed down in order to prevent light trespass onto adjacent properties. The Special Permit Granting Authority may modify this requirement if, upon recommendation by the Police Chief, it is required for adequate safety and security.

   c. *Landscaping:* The proposed site shall provide landscaping to harmonize the LME with abutting uses. Landscaping shall be provided as per the requirements listed in Code Article VI, 255-24 & 25. Trees and shrubs may be clustered. Landscaping must consist of native, non-invasive plant species. The City Council may modify or waive this requirement.

   d. *Drive-Through Facilities:* LME's are prohibited from installing an on-site drive through facility.

   e. *Fencing:* Fencing may be required if determined necessary by the City Council. The location, height and type of fencing may be determined by the City Council as a condition of the Special Permit approval. In no instance shall barbed-wire fencing be permitted.

f. *Waste Disposal:* There shall be no outdoor storage of waste, including dumpsters, for any marijuana retailer. All waste generated shall be secured indoors, to be serviced by a professional janitorial company, or medical waste company.

g. *Ventilation:* All LME's must ventilate in a manner so as that no pesticides, insecticides, or other chemicals or products used in cultivation or processing are dispersed into the outside atmosphere. Ventilation must also ensure that no odor from marijuana processing or consumption can be detected by a person with an unimpaired and otherwise normal sense of smell at the exterior of the LME or at any adjoining use or property.

**J. Filing Requirements.**

1. Applications to permit an LME must be submitted to the City Council, or their designee(s). Such applications for LME's shall include the following:

   a. *Site Plan:* A site plan shall be submitted that includes all information required per Code Chapter 255-80 (c), and must also include the following.
      i. The names, mailing addresses, phone numbers, email addresses, and signatures of the applicant, owner, and operator.
      ii. Physical address (if one exists), and the map, lot, and block number of the proposed site.

   b. *Security Plan:* A security plan shall be submitted, to ensure the safety of employees, patrons, and the public to protect the premises from theft or other criminal activity. The security plan shall be reviewed and approved by the local Police Chief, or their designee. The plan must include the following: An interior floorplan (including secured areas, windows, doors, etc...), exterior lighting, fencing (if any), gates (if any), alarms, and any other security measures requested by the Police Chief.

   c. *Traffic Study:* The City Council may require a traffic study that includes an analysis of traffic generation, circulation, and off-street parking demand to determine sufficient parking and optimum configuration for site ingress and egress.

   d. *State License:* A copy of the license or registration as an LME from the Massachusetts Cannabis Control Commission or documentation that demonstrates that said facility and its owner/operators qualify and are eligible to receive a Certification of Registration and meet all of the requirements of an LME in accordance with the regulations adopted by the Commission, as amended.

   e. *Proof of Site Control:* Evidence that the Applicant has site control and the right to use the site for an LME in the form of a deed, valid lease, or purchase & sale agreement or a notarized statement from the property owner certifying the Applicant has firm site control.



    f.  *Odor Control:* The odor control plan proposed adequately provides for the ongoing safe operation of the establishment and minimizes any adverse impacts to abutting properties from odor-emitting activities to be conducted on-site.

    g.  *10 Percent Contribution:* A list shall be submitted that lists all persons or entities contributing 10% or more of the initial capital to operate the LME, including capital in the form of land or buildings.

**K. Discontinuance of Use.**

1. Any LME under this Section shall be required to remove all material, plants, equipment, and other paraphernalia in compliance with regulations established by the Cannabis Control Commission within thirty (30) days after the expiration or voiding of its license.

2. The City Council may require the Marijuana Establishment to fund an escrow account in an amount sufficient to adequately support the dismantling and winding down of the Marijuana Establishment within sixty (60) days of final approval of the Special Permit.

**L. No City Liability, Indemnification.**

1. The Applicant and all licensees waive and release the City, its elected officials, employees, and agents from any liability for injuries, damages, or liabilities of any kind that result from any arrest or prosecution of the LME owners, operators, employees, clients, or customers for a violation of state or federal laws, rules, or regulations.

2. The Applicant, in receiving approvals issued pursuant to this chapter, and all licensees, jointly and severally, if more than one, agree to indemnify, defend and hold harmless the City, its elected officials, employees, attorneys, agents, insurers and self-insurance pool against all liability, claims and demands on account of any injury, loss or damage, including, without limitation, claims arising from bodily injury, personal injury, sickness, disease, death, property loss or damage or any other loss of any kind whatsoever, arising out of or in any manner connected with the operation of the LME that is subject of the approval/license.

**M. Annual Inspection**

1. Any operating LME within the City shall be inspected annually by the Building Inspector, or their designee, to ensure compliance with this Section, and with any conditions imposed by the City Council as a condition of the Special Permit approval.

2. The first annual inspection shall be more than one (1) year after beginning operation, but before two (2) years of beginning operation.

**N. Other Laws Remain Applicable.**

1. At all times while a permit is in effect the licensee shall possess all required licenses.

2. To the extent that the state has adopted or adopts in the future any additional or stricter law or regulation governing the cultivation, manufacturing, testing or retail of marijuana or marijuana products, the additional or stricter regulation shall control the LME in the City. Compliance with any applicable state law or regulation shall be deemed an additional requirement for issuance or denial of any license under this chapter, and noncompliance with any applicable state law or regulation shall be grounds for revocation or suspension of any license issued hereunder.

3. Any LME may be required to demonstrate, upon demand by law enforcement officers of the City of Haverhill and/or the local licensing authority, the source and quantity of any marijuana found upon the license premises are in full compliance with any applicable state law or regulation.

4. The issuance of any license pursuant to this chapter shall not be deemed to create an exception, defense or immunity to any person in regard to any potential criminal liability the person may have for the cultivation, possession, sale, distribution, or use of marijuana.

5. Prior to the issuance of a Special Permit, the LME must have entered into a Host Community Agreement (HCA) with the City. If, upon review by the City Council, the LME is found to not be fully in compliance with the HCA, the Special Permit and/or the local license may be suspended or rescinded."

Approved as to Legality

City Solicitor

PLACED ON FILE for at least 10 days  and REFER TO PLANNING BOARD JANUARY 9 2019

TO COME BACK TO CITY COUNCIL: JANUARY 15 2019
Attest:

Acting City Clerk

IN CITY COUNCIL: January 15 2019
ON MOTION OF COUNCILLOR LEPAGE TO AMEND THE DOCUMENT AS FOLLOWS: In Section D #4 after the words "located within" by striking the word "on" and inserting in place thereof the word "one"  AND
MOTION PASSED and
PASSED AS AMENDED
Attest:

_____ Acting City Clerk

APPROVED:

_____ Mayor

# Chapter 255. Zoning

# Article XVII. Medical Marijuana Overlay District

## § 255-176. Purpose.

The purpose of this article is to provide for the placement of RMDs, in accordance with the Humanitarian Medical Use of Marijuana Act, MGL c. 94C, App. § 1-1 et seq., in locations suitable for lawful medical marijuana facilities and to minimize adverse impacts of RMDs on adjacent properties, residential neighborhoods, historic districts, schools, playgrounds and other locations where minors congregate by regulating the siting, design, placement, security, and removal of RMDs.

## § 255-178. Location.

A.   RMDs may be permitted in the MMOD pursuant to a special permit.

B.   RMDs may not be located within 500 linear feet of the following:

(1)  School, including a public or private elementary, vocational, or secondary school or a public or private college, junior college, or university;

(2)  Child care facility;

(3)  Library;

(4)  Playground;

(5)  Public park;

(6)  Youth center;

(7)  Public swimming pool;

(8)  Video arcade facility; or

(9)  Similar facility in which minors commonly congregate.

C.   The distance requirement may be reduced by 25% or less, but only if:

(1)  The applicant demonstrates that the RMD would otherwise be effectively prohibited within the municipality;

(2)  The applicant demonstrates that the RMD will employ adequate security measures to prevent diversion of medical marijuana to minors who are not qualifying patients pursuant to 105 CMR 725.004.

Chapter 255 Zoning

# Article X Administration and Enforcement

## § 255-65 Administrative official.
[Amended 6-6-1978 by Doc. 103-C]

The Building Inspector is hereby appointed and authorized to administer and enforce the provisions of this chapter and shall be charged with the enforcement of this chapter and shall withhold a permit for the construction, alteration or moving of any building or structure if the building or structure, as constructed, altered or moved would be in violation of this chapter. If the Building Inspector, charged with enforcement of this chapter, is requested, in writing, to enforce this chapter against any person allegedly in violation of the same and declines to act, he shall notify, in writing, the party requesting such enforcement of any action or refusal to act and the reasons therefor within 14 days of receipt of such request.

## § 255-66 Permit required.

A.   It shall be unlawful for any owner or person to erect, construct, reconstruct, convert or alter a structure or change the use or extend the use of any building, sign or other structure or lot without applying for on the forms provided for and receiving from the Building Inspector the required permit therefor. For purposes of administration, such permit and application procedure involving a structure may be made at the same time and combined with the permit required under the Building Code. Where the application does not involve a structure but only a lot, a permit shall be applied for and may be issued.

   (1)   Prior to the issuance of any permit, the Building Inspector shall determine that the street or way which provides frontage and access to a lot(s) has, for the entire length of the lot(s) frontage, sufficient width, suitable grades/topography and adequate construction to provide for the needs of vehicular traffic in relation to the proposed use of the land and for the installation of municipal services to safely and sufficiently serve such land and the buildings erected or to be erected thereon. Any question as to the adequacy of a street or way shall be referred to the Planning Board for the submission of a plan to determine the adequacy of the street or way. Any improvements approved by the Planning Board shall follow normal lot release procedures relative to providing surety for the required improvements. [Added 6-27-2000 by Doc. 79-E]

   (2)   In addition to all other requirements herein, prior to the issuance of any permit for a property located within the Watershed Protection Overlay District shall provide to the Building Inspector one of the following: [Added 6-27-2000 by Doc. 79-E]

      (a)   Evidence that the property is exempt from the chapter.

      (b)   Evidence of the granting of a special permit.

      (c)   A completed watershed review form filed with the site plan for the property providing details on the activity to occur within the Watershed District and all required information.

   (3)   In addition to all other requirements herein, prior to the issuance of any permit, the applicant shall file a written report as part of the application detailing how compliance with each of these requirements will be accomplished. The development shall be integrated into the existing terrain. Building sites shall, to the extent feasible: [Added 6-27-2000 by Doc. 79-E]

      (a)   Minimize use of wetlands, steep slopes, floodplains and hilltops.

      (b)   Reserve natural and historic features.

      (c)   Maximize open space preservation.

      (d)   Minimize obstructions of scenic views from publicly accessible locations.

      (e)   Minimize tree, vegetation and soil removal, blasting and grade changes.

(f)  Screen objectionable features from neighboring properties and roadways.

(4)  Prior to the issuance of any permit, the Building Inspector must determine that the lot is a buildable lot (as defined by this chapter).
[Added 6-27-2000 by Doc. 79-E]

B.   The following shall be exempt from this section:

(1)  Replacing copy. The changing of advertising copy or message on an approved painted or printed sign or on theater marquees and similar approved signs which are specifically designed for the use of replaceable copy.

(2)  Temporary signs, per § 255-35 and signs under § 255-36 of this chapter.

(3)  Structural improvements or changes that are exempted by the Building Code and do not change the height, number of stories, size, use or location of a structure.

(4)  Repairs as defined by this chapter.

C.   Phased development subdivisions and Form A lots.
[Amended 6-27-2000 by Doc. 79-D]

(1)  Building permits for the construction of single-family, two-family and three-family dwellings in a subdivision or on contiguous Form A lots held in common or related ownership on the effective date of the provision shall not be granted at a rate per annum greater than as permitted by the following schedule:

| Number of Lots | Minimum Years of Development | Maximum Lots Developed per Year |
| --- | --- | --- |
| 1 to 6 | 1 | All |
| 7 to 20 | 2 | 50% of total |
| 21 to 34 | 3 | 33% of total |
| 35 to 50 | 4 | 25% of total |
| 51 to 75 | 5 | 20% of total |
| 76 to 125 | 6 | 16.7% of total |
| 126 or more | 7 | 14.3% of total |

(2)  Lots can be sold any time for the construction of dwellings in the designated future years. However, any lots covered by this provision hereafter sold or otherwise transferred to another owner shall include in the deed the earliest date on which construction may be commenced in accordance with these provisions.

(3)  If there is a proposed subdivision with any lots that are within 1,000 feet of lots in another subdivision held by common or related ownership, then both subdivisions shall be construed to be a single subdivision for the purpose of this Subsection C.

(4)  Lot lines for Form A lots shall be defined when the Form A lots have been endorsed by the Planning Board. Subsequent changes in the shape or ownership of lots shall not render the provision of this Subsection C void.

(5)  The anniversary date of each subdivision or contiguous Form A lots under this provision shall be no earlier than the date on which all approvals required for the first building permit have been obtained.

(6)  Each year in which any building permit is issued after the anniversary date as defined above and before the next and succeeding anniversary date shall be considered one year of development for purposes of Subsection C(1) hereof. Only those years during which a building permit is issued shall constitute a year of development. Intervening years in which no building permit is issued shall not constitute a year of development and shall not be considered when determining minimum years of development for purposes of Subsection C(1) hereof.

(7)  The Planning Board, in conjunction with the Building Inspector, shall be responsible for administering this section of the chapter.

(8)  The invalidity of one or more provisions or clauses of this section shall not invalidate or impair the section as a whole or any other part thereof.

(9)  The provisions of this Subsection C shall apply to building permits issued by the City of Haverhill.

(10)  The provisions of this Subsection C shall not apply to definitive subdivision plans or Form A plans which have been approved or endorsed by the Planning Board prior to adoption of this subsection.

D.  Growth management.
    [Added 3-4-1997 by Doc. 21-B]

(1)  Intent and purpose. This Subsection D is adopted for the following purposes:

   (a)  To ensure that growth occurs in an orderly and planned manner, at a rate that can be supported by City services, while avoiding large year-to-year variations in the development rate;

   (b)  To provide the City with time to study the effect of growth on the municipality's infrastructure, character and municipal services, to install water transmission facilities and to address required additional supply and distribution system improvements so as to be able to achieve a positive safe yield capacity in order to support additional new growth;
        [Amended 6-27-2000 by Doc. 79-F]

   (c)  To relate the timing of residential development to the City's ability to provide adequate public safety, schools, roads and municipal infrastructure and human services at the level of quality which citizens expect and to the City's ability to pay under the financial limitations of Proposition 2 1/2, as outlined in the City's Master Plan of 1990;

   (d)  To preserve and enhance the existing community character and value of property; and

   (e)  To allow departures from the strict application of the growth rate measures herein in order to encourage certain types of residential growth which address the housing needs of specific population groups or which provide significant reductions in the ultimate residential density of the City.

(2)  Applicability; effect; definitions.

   (a)  Beginning on March 4, 1997, no building permit for a new dwelling unit or units shall be issued unless in accordance with the regulations of this Subsection D, unless exempted herein.

   (b)  The provisions of this Subsection D shall expire on December 31, 2003.
        [Amended 2-16-1999 by Doc. 162-B; 6-27-2000 by Doc. 79-F; 12-18-2001 by Doc. 156-B; 1-14-2003 by Doc. 189-B/02]

   (c)  For the purposes of this Subsection D, the following terms shall have the following meanings:

        **DEVELOPMENT**
        A single parcel or set of contiguous parcels of land held in common ownership at any time on or after the date of adoption of this subsection, for which one or more building permits will be sought.

        **DEVELOPMENT SCHEDULE**
        A schedule authorized by the Planning Board in accordance with Subsection D(4).

        **GROWTH RATE LIMIT**
        The maximum number of building permits that may be authorized will be 100 permits per year. The growth rate limit is based upon an analysis of recent average growth rates and the 1990 Master Plan's policies and implementation strategies to manage the current high level of residential growth in the City. Units exempt under Subsection D(6) are included within the calculation of the growth rate limit.
        [Amended 6-27-2000 by Doc. 79-F]

(3)  Planned growth rate.

(a)  The growth rate limit shall be based on a growth rate of 100 permits per year.
[Amended 10-26-1999 by Doc. 118-B; 6-27-2000 by Doc. 79-F]

(b)  Whenever the number of building permits issued for new dwelling units exceeds the applicable growth rate limit, the Building Inspector shall not issue building permits for any additional dwelling unit or units unless such unit or units are exempt from the provisions of this Subsection D.

(c)  The Planning Board shall not approve any development schedule under § 255-66C which would result in authorizations exceeding the applicable growth rate limit.

(d)  Building permits authorized by a development schedule, but not acquired during the scheduled period set forth in § 255-66C shall not be counted in computing the applicable growth rate limit. Building permits issued, but subsequently abandoned under the provisions of the State Building Code, shall not be counted in computing the applicable growth rate limit.

(4)  Development scheduling.

(a)  This Subsection D(4) shall apply to the following types of development which would result in the creation of new dwelling units:

[1]  Definitive subdivision plans;

[2]  Plans subject to MGL c. 41, § 81P;

[3]  Special permit developments subject to this chapter; and

[4]  Use variances.

(b)  In addition to the types of development described in Subsection D(4)(a), the Planning Board is authorized, upon request, to approve a development schedule for any other building lot or dwelling unit, specifying the month and year in which such lot/unit shall be eligible for a building permit.

(c)  Dwelling units shall be considered as part of a single development for purposes of development scheduling in accordance with § 255-66C.

(d)  Where, consistent with the applicable growth rate limit, building permits or the construction of new residential units in the types of development set forth in Subsection D(4)(a) shall be authorized only in accordance with § 255-66C.

(e)  Where the applicable growth rate limit does not allow development consistent with the table set forth above, the Planning Board shall establish a development schedule which allows fewer than the maximum number of dwelling units per year. However, the Planning Board shall not establish any development schedule which phases development for longer than a ten-year period.

(5)  Procedures for development schedules.

(a)  In order to facilitate review, the developer may submit a written proposed development schedule to the Planning Board as part of any application for a preliminary or definitive subdivision approval or any application for approval of a plan subject to MGL c. 41, § 81P.

(b)  In cases where the developer has elected not to submit a development schedule in accordance with Subsection D(5)(a) above, the Building Inspector shall refer any application for a building permit on a lot within these types of plans to the Planning Board for development scheduling.

(c)  The developer shall submit a written proposed development schedule as part of any application for a special permit or use variance. In the case of a use variance, the Board of Appeals shall forthwith refer said document to the Planning Board.

(d) The Planning Board shall approve a development schedule which is consistent with the provisions of this subsection.

(e) Approved development schedules for the types of development described in Subsection D(4)(a) shall be incorporated, where appropriate, as part of the decision filed with the City Clerk, whether inscribed on the plan and/or filed as a separate, attached document. In the alternative, development schedules pertaining to plans subject to MGL c. 41, § 81P, shall be separately recorded if the developer does not elect to use the procedures of Subsection D(3)(b).

(f) No approved development schedule shall take effect for the purposes of obtaining building permits until recorded separately or as part of the decision.

(g) After approval of a development schedule by the Planning Board in accordance with Subsection D(4), an application for a building permit in conformance with the approved schedule shall be approved and the permit issued even if the applicable growth rate limit calculated pursuant to Subsection D(3)(b) has been reached.

(h) If applications for building permits are made at a slower rate than authorized in a development schedule, applications for the unused permits from one period may be made in a later period; and such applications shall be approved and the permits issued even if the applicable growth rate limit has been reached in the later period.

(i) Upon transfer of any lot or unit in the types of development subject to development scheduling, the deed shall reference the development schedule and state the earliest date on which construction may be commenced in accordance with the provisions of this subsection.

(6) Exemptions. The following developments are specifically exempt from the planned growth rate and development scheduling provisions of this subsection:
[Amended 6-27-2000 by Doc. 79-F]

(a) Dwelling units in the types of development set forth in Subsection D(4)(a) which are exempt by virtue of the provisions of MGL c. 40A, § 6.

(b) An application for a building permit for the enlargement, restoration or reconstruction of a dwelling in existence as of the effective date of this subsection, provided that no additional residential unit is created.

(c) Dwelling units for low- and/or moderate-income families or individuals, where all of the following conditions are met:

[1] Occupancy of the units is restricted to households qualifying under the Local Initiative Program as administered by the Executive Office of Communities and Development.

[2] The affordable units are subject to a properly executed and recorded deed restriction running with the land which shall limit each succeeding resale price to an increase of 10%, plus any increase in the consumer price index, plus the cost of any improvements certified by the Building Inspector.

(d) Any single- or two-family dwelling in the RH and RU Zone which is otherwise properly allowed by this chapter.
[Added 1-14-2003 by Doc. 189-B/02]

(e) Any tract of land existing and not held in common ownership with an adjacent parcel on the effective date of this Subsection D shall receive a one-time exemption from the Planned Growth Rate and Development Scheduling provisions for the purpose of constructing one single- or two-family dwelling, which is otherwise allowed by this chapter, on the parcel.
[Amended 1-14-2003 by Doc. 189-B/02]

(7) Zoning change protection. Any protection against zoning changes provided by MGL c. 40A, § 6, shall be extended to the earliest date on which the final unit in the development could be authorized under this subsection.

(8) Severability. The provisions of this subsection are hereby declared separable and if any provision shall be held invalid or unconstitutional, it shall not be construed to affect the validity or constitutionality of any of the remaining provisions of

this subsection or act in relation thereto.

## § 255-67 Other approvals required.

Where authorization of a use of land or of a structure is required by the Board of Appeals or City Council, a copy of such written authorization shall be sent by the Clerk of the Board or Council to the Building Inspector within 14 days of granting of approval and shall be received by the Building Inspector prior to the issuance of a permit. In addition, the Building Inspector in such cases where the Board or Council has granted a limited or conditional zoning variance or special permit shall not issue a permit until the applicant submits an affidavit from the Essex County Registry of Deeds that the authorization of the Board or Council is recorded. Furthermore, the Building Inspector shall not issue a permit where approval under the Subdivision Control Law by the Planning Board is required; and/or approval by the Mayor, State Department of Natural Resources and the State Department of Public Works for the filling of wetlands; and/or a certificate of appropriateness from the Historic District Commission, if and when required; and/or a covenant or offer for acceptance of open space under §§ 255-93 and 255-94 of this chapter, until these requirements are met in writing. Authorization for a permit shall be null and void if the applicant has not obtained his permit from the Building Inspector after one year from the date of approval of his application by the City Council or the Board.

## § 255-68 Site plan required; contents; site plan review.
[Amended 7-8-1997 by Doc. 73-B; 6-27-2000 by Doc. 79-F]

A.    Site plan required; contents.

(1)    In addition to plans and drawings required for submission under regulations of the Building Code, all applications for permits shall be accompanied by seven copies of a site plan. One copy of such plan shall be returned to the applicant if approved by the Building Inspector. Such site plan shall be drawn to scale showing all detail and plan level information on approved plans and, in the absence of any other plan, approval shall include the actual dimensions of the lot to be built upon, the exact size and locations on the lot of any existing building and those buildings to be erected, location and design of off-street parking and loading spaces, signs and such other information as may be necessary to determine and provide for enforcement of this chapter. Clear reference shall be made on any site plan to any other plans affecting the subject site, including, but not limited to, Planning Board plans and approvals, conservation plans and approvals, Board of Appeals plans and approvals and Board of Health plans and approvals. In addition to the above information, if the property is located in the Watershed Protection Overlay District, the site plan shall contain the following:

(a)    Evidence that the property is exempt from the chapter.

(b)    Evidence of the granting of a special permit.

(c)    A completed watershed review form filed with the site plan for the property providing details on the activity to occur within the Watershed District and all required information.

(2)    The information required on the site plan may be combined with the information required under Article XI for any site plan.

B.    Site plan review.

(1)    Prior to the issuance of any permit for new construction of units, the applicant shall file a plan containing all of the above information with the Planning Department for a coordinated review of the site plan by City departments. The purpose of this review is to ensure, prior to actual construction, that the plans are in compliance with all prior approvals from various boards and commissions as applicable and fully incorporate the requirements of those approvals. If, in the opinion of the relevant City departments, the work proposed deviates from the approved plans or the review indicates that what is depicted in the plan may cause changes to the topography and/or vegetation on the site such that stability of the earth on the site or natural flow of water or drainage on the site may be affected in such a way as to cause adverse impact to the adjoining land or streets or ways, then the Building Inspector shall require the applicant to provide a modified plan for abatement of such an adverse effect(s), and failure by the applicant to implement all work in conformance with such a site plan shall be a violation of this chapter subject to all enforcement provisions of this chapter.

(2)  Prior to the issuance of any permit which is for construction other than new construction, if, in the opinion of the Building Inspector, the work proposed may cause changes to the topography and/or vegetation on the site such that stability of the earth on the site or natural flow of water or drainage on the site may be affected in such a way as to cause adverse impact to the adjoining land or streets or ways, then the Building Inspector shall require the applicant to provide a site plan containing all information outlined in Subsection B(1) above, to the Planning Department for review. Such site plan shall detail all mitigation methods proposed to abate such an adverse effect, and failure by the applicant to implement such a site plan shall be a violation of this chapter subject to all enforcement provisions of this chapter.

(3)  The Planning Department shall seek the review and approval of all applicable City departments as is deemed necessary, prior to approval of any such site plan.

(4)  The Building Inspector, shall issue a cease-and-desist order for a violation of the site plan, then the Building Inspector shall require the applicant to post a bond sufficient for compliance with the site control plan and any requirements thereof as a condition prerequisite to the lifting of the cease-and-desist order.

## § 255-69 Certificate of use and occupancy required.

It shall be unlawful to use or occupy any structure or lot for which a permit is required herein without the owner applying for and receiving from the Building Inspector a certificate of use and occupancy. Such certificate may be combined with the one which may be issued under the Building Code. The Building Inspector shall take action within 14 days of receipt of an application for a certificate of use and occupancy. Failure of the Building Inspector to act within the 14 days shall be considered approval.

## § 255-70 Permit and application fees.

Fees shall be as established by the City Council.[1]

[1]    *Editor's Note: Current fees are on file in the office of the City Clerk.*

## § 255-71 Permit time limits.

Any work for which a permit has been issued by the Building Inspector shall be actively prosecuted in accordance with the Building Code.

## § 255-72 Notice of violation; previously issued permits.

A.  The Building Inspector shall serve a notice of violation and order to any owner or person responsible for the erection, construction, reconstruction, conversion or alteration of a structure or change in use, or extension of use of any building, sign or other structure or lot in violation of any approved plan, information or drawing pertinent thereto; or in violation of a permit or certificate issued under the provisions of this chapter, and such order shall direct the immediate discontinuance of the unlawful action, use or condition and the abatement of the violation. Any owner or person responsible who has been served with a notice and ceases any work or other activity, shall not leave any structure or lot in such a condition as to be a hazard or menace to the public safety, health, morals or general welfare.

B.  No action, suit or proceeding shall be maintained in any court, nor any administrative or other action taken, to recover a fine or damages or to compel the removal, alteration or relocation of any structure or part of a structure or alteration of a structure by reason of any violation of this chapter except in accordance with the provisions of this section, §§ 255-75 and 255-84; provided, however, that if real property has been improved and used in accordance with the terms of the original building permit issued by a person duly authorized to issue such permits, no action, criminal or civil, the effect or purpose of which is to compel the abandonment, limitation or modification of the use allowed by said permit or the removal, alteration or relocation of any structure erected in reliance upon said permit by reason of any alleged violation of the provisions of Chapter 40A, or of this chapter adopted thereunder, shall be maintained, unless such action, suit or proceeding is commenced and notice thereof recorded in the Essex County Registry of Deeds within six years next after the commencement of the alleged violation of law. Such notice shall include names of one or more of the owners of record, the name of the person initiating the action and adequate identification of the structure and the alleged violation.

[Added 6-6-1978 by Doc. 103-C]

## § 255-73 Penalties for violations.
[Amended 3-29-1983 by Doc. 30-C; 3-26-1985 by Doc. 69]

Any owner or person who violates or refuses to comply with any of the provisions of this chapter may, upon conviction, be fined a sum of a minimum of $25 or 1% of the property value as stated on the building permit, up to $300 per day, for each offense. Each day, or portion of a day, that any violation is allowed to continue shall constitute a separate offense.

## § 255-74 Board of Appeals.

A.   **Creation; membership; vacancies; advisor.** There is hereby created a Board of Appeals of five members and two associate members. Members of the Board in office at the effective date of this chapter shall continue in office. Hereafter, as terms expire, the Mayor shall make appointments in the month of December for a term of office commencing on the following first day of January, for a term of five years for the five regular members and for a term of one year for the two associate members, so that the term of one regular member and the two associate members shall expire each year. If a vacancy should occur during the course of the year, the Mayor shall fill such vacancy within 45 days in the same manner as an original appointment; the appointee shall serve for the unexpired term remaining for the position. The Administrator of the Department of Planning and Development or his designee shall act as an ex officio adviser (sharing all the responsibilities of a regular Board member except not the voting privilege) to the Board.
[Amended 6-6-1978 by Doc. 103-C; 3-29-1983 by Doc. 29-C]

B.   **Chairman; removal of members; associate members; rules and regulations.**
[Added 6-6-1978 by Doc. 103-C]

   (1)   Each Zoning Board of Appeals shall elect annually a Chairman from its own number and a Clerk and may employ experts and clerical and other assistants.

   (2)   Any member may be removed for cause by the appointing authority upon written charges and after a public hearing.

   (3)   The Chairman of the Board may designate any such associate member to sit on the Board in case of absence, inability to act or conflict of interest on the part of any member thereof, or in the event of a vacancy of the Board until said vacancy is filled.

   (4)   The Board of Appeals shall adopt rules, not inconsistent with the provisions of this Zoning Ordinance for the conduct of its business and shall file a copy of said rules with the City Clerk.

C.   **Powers and duties.**
[Added 6-6-1978 by Doc. 103-C]

   (1)   The Board of Appeals shall have the following duties and powers:

      (a)   To hear and decide appeals in accordance with § 255-75.

      (b)   To hear and decide applications for special permits, as set forth in § 255-80, upon which the Board is empowered to act under this chapter.

      (c)   To hear and decide petitions for variances, as set forth in § 255-79, upon which the Board is empowered to act under this chapter.

   (2)   In exercising the powers granted by this subsection, the Board of Appeals may make orders or decisions, reverse or affirm in whole or in part, or modify any order or decision and to that end shall have all the powers of the officer from whom the appeal is taken and may issue or direct the issuance of a permit.

## § 255-75 Appeals.
[Amended 6-6-1978 by Doc. 103-C]

Appeals to the Board shall be taken in accordance with the rules of the Board and the Zoning Act and may be taken by any person aggrieved by reason of his inability to obtain a permit or enforcement action from the Building Inspector under the provisions of

this chapter, by the Merrimack Valley Planning Commission or by any person including an officer or board of this City, or of an abutting City or town aggrieved by an order or decision of the Building Inspector or other administrative official in violation of any provision of this chapter. Further appeals shall be taken in accordance with § 255-84 of this chapter. Any appeal under this section shall be taken within 30 days from the date of the order or decision which is being appealed by filing a notice of appeal, specifying the grounds thereof, with the City Clerk, who shall forthwith transmit copies thereof to such officer or board whose order or decision is being appealed and to the Board of Appeals. Such officer or board shall forthwith transmit to the Board of Appeals all documents and papers constituting the record of the case in which the appeal is taken.

## § 255-76 Application for appeals.
[Amended 6-6-1978 by Doc. 103-C]

Written application for authorization for a permit by action of the Board shall be made on forms provided by the Board and shall include a copy of all information submitted to the Building Inspector in the application for a permit and four copies of the required plot plan. Applications for appeals shall be filed by the petitioner with the City Clerk, who shall forthwith transmit them to the Clerk of the Board of Appeals for administration. The official date of filing shall be the date recorded by the City Clerk upon receipt of the executed forms.

## § 255-77 Action on appeals, special permits and variances.
[Amended 6-6-1978 by Doc. 103-C]

A.  Meetings of the Board (or City Council, where applicable) shall be held at the call of the Chairman (or Council President, where applicable), or when called in such other manner as the Board (or City Council, where applicable) shall determine in its rules.

B.  The Board of Appeals (or City Council, where applicable) shall hold a hearing on any appeal, application or petition transmitted to it by the City Clerk within 65 days from the transmittal to the Board (or City Council, where applicable) of such appeal, application or petition. The Board (or City Council, where applicable) shall cause notice of such hearing to be published and sent to parties in interest as provided for herein, and shall notify the Planning Board and the Planning Boards of all adjacent cities and towns which may forward recommendations with respect to said matter for the consideration of the Board of Appeals (or City Council, where applicable). The Chairman (or Council President, where applicable), or in absence the Acting Chairman (or Council Vice President, where applicable), may administer oaths, summon witnesses and call for the production of papers.

C.  A vote of four members of the Board consisting of five members or a vote of six members of a Council consisting of nine members shall be necessary to reverse any order or decision of any administrative official under this chapter or to effect any variance in the application of this chapter.

D.  All hearings of the Board of Appeals (or City Council, where applicable) shall be open to the public. The decision shall be made within 75 days after the date of filing of an appeal, application or petition (except in regard to special permits, where such decision shall be made within 90 days after the date of public hearing, for which notice has been given, as provided in § 255-101 of this chapter). Failure by the Board (or City Council, where applicable) to act within said 75 days (or 90 days, where applicable) shall be deemed to be the grant of the relief, application or petition sought, subject to an applicable judicial appeal as set forth in § 255-84. The Board (or City Council, where applicable) shall cause to be made a detailed record of its proceedings, indicating the value of each member upon each question or, if absent or failing to vote, indicating such fact and setting forth clearly the reason or reasons for its decision and of its official actions, copies of all of which shall be filed within 14 days in the office of the City Clerk and shall be a public record, and notice of the decision shall be mailed forthwith to the petitioner, applicant or appellant, to the parties in interest designated in § 255-101 and to every person present at the hearing who requested that notice was to be sent. Each notice shall specify that appeals, if any, shall be made pursuant to § 255-84 and shall be filed within 20 days after the date of filing of such notice in the office of the City Clerk.
[Amended 3-13-1979 by Doc. 299-C]

E.  Upon the granting of a variance or special permit on any extension, modification or renewal thereof, the Board of Appeals (or City Council, where applicable) shall issue to the owner, and to the applicant if other than the owner, a copy of its decision, certified by the City Clerk, containing the name and address of the owner, identifying the land affected, setting forth

compliance with the statutory requirements for the issuance of such variance or permit and certifying that copies of the decision and all plans referred to in the decision have been filed with the Planning Board and City Clerk.

## § 255-78 Interpretation of chapter.

On appeal from an order or decision made by the Building Inspector, or on request by any officer or board of the City, the Board shall have the power to decide any of the following questions:

A.    Determination of the meaning of any provision of the text of this chapter.

B.    Determination of the exact location of any district boundary shown on the Zoning Map.

## § 255-79 Variances.

A.    The Board, after public hearing notice has been given by publication and posting as provided for in § 255-101 and by mailing to all parties of interest, may and is authorized to grant, upon appeal or upon petition with respect to particular use, land or existing structures, a variance from the terms and requirements of this chapter where the Board specifically finds that, owing to circumstances relating to the soil conditions, site shape or topography of such land or structures, and, especially affecting such land or structure, but not affecting generally the zoning district in which it is located, a literal enforcement of the provisions of this chapter would involve substantial hardship, financial or otherwise, to the petitioner or appellant, and that desirable relief may be granted without substantial detriment to the public good and without nullifying or substantially derogating from the intent or purpose of this chapter. A use variance may only be granted to existing nonconforming structures for the particular or similar type of use requested, as determined by the Board.
[Amended 6-6-1978 by Doc. 103-C; 3-13-1979 by Doc. 299-C]

B.    With the exception of petitions where no exterior alterations of structures and no increase in existing conforming parking are required, all applications for variances, including dimensional variances, shall be accompanied by a reproducible original and nine copies of the following described site plan: The plan shall be 8 1/2 inches by 11 inches or larger, drawn to a scale of one inch equals 40 feet or such smaller scale as may be necessary, indicating zoning districts, names of properties which abut the subject property, existing property lines and the exact location of existing buildings and any proposed additions, which shall accurately be drawn, signed and stamped by a registered land surveyor. Cited exceptions must be accompanied by a site plan showing the above relevant items but need not be drawn, signed and stamped by a registered land surveyor. The dimensions of the lot, percentage of the lot covered by the principal and accessory buildings, the required parking spaces, entrances, exits, driveways, planting strips, signs, etc., that are pertinent to the granting of the variance shall also be shown.
[Added 3-13-1979 by Doc. 299-C; amended 6-9-1981 by Doc. 79-C; 5-22-1984 by Doc. 60-B; 6-10-1992 by Doc. 52-C]

(1)    When a variance is requested to subdivide a parcel of land, the dimensions and areas of the surrounding lots may be taken from the deed or site plan for comparison of the size of lots in the neighborhood, noted on the plan as such and marked "approximate." Any plans presented with the petition shall remain a part of the record of the Board of Appeals.

(2)    When a petition is filed for a sign variance, the accompanying plan shall show, in addition to the location of the sign, the sign area and height in relation to the respective building height, size or length.

(3)    If living quarters are to be remodeled or areas to be converted into living quarters, in addition to the required site plan, nine copies of the following described plan shall be furnished:

(a)    A floor plan of each floor on which remodeling is to be done or area converted into living quarters;

(b)    A floor plan showing the stairways, halls, doors opening into the halls and exit doors of each floor or floors where remodeling or converting is to be done; and

(c)    An elevation of the parts of the building where outside stairways or fire escapes are to be located. The plans and elevations shall be clearly illustrated. The size of each plan shall be 11 inches by 17 inches or 22 inches. It shall be drawn to scale 1/4 inch equals one foot.

(4)    An application for a dimensional variance or use variance that requires the recording of a plan must be accompanied by a recordable linen or Mylar plan, and said plan must contain a registered land surveyor's seal and signature and must comply with all other recording rules of the Registry of Deeds.

(5) All plans and elevations presented with the application shall remain a part of the records of the Board of Appeals. The provision of the plan and the application form shall be the sole responsibility of the applicant.

(6) The Building Inspector, at the time of initial application review, shall confirm to the Board that all site/building plans submitted are in total compliance with the Board's rules and regulations.

C.  Before any variance is granted, the Board must find all of the following conditions to be present:

(1) Conditions and circumstances are unique to the applicant's lot, structure or building and do not apply to the neighboring lands, structures or buildings in the same district.

(2) Strict application of the provisions of this chapter would deprive the applicant of reasonable use of the lot, structure or building in a manner equivalent to the use permitted to be made by other owners of their neighborhood lands, structures or buildings in the same district.

(3) The unique conditions and circumstances are not the result of actions of the applicant taken subsequent to the adoption of this chapter.

(4) Relief, if approved, will not cause substantial detriment to the public good or impair the purposes and intent of this chapter.

(5) Relief, if approved, will not constitute a grant of special privilege inconsistent with the limitations upon other properties in the district.

D.  The following circumstances may be construed as establishing a basis for determining that a hardship exists within the meaning of this section:

(1) Where by reason of exceptional narrowness, shallowness or unusual shape of a specific site at the time of the effective date of this chapter or to which this is amended, or by reason of exceptional topographic conditions or other extraordinary and exceptional physical situations or condition of such site of property, the literal enforcement of the requirements of this chapter pertaining to yards or other space relationships or total land area would result in exceptional practical difficulties or exceptional and undue hardship upon the owner of such property.

(2) In the case of corner lots where on all other corners of the intersection there are buildings or uses that do not conform to the regulations prescribed by this chapter for the district in which said lot is located and where said lot faces one or more of said other uses, or in the case of an interior lot there are buildings on the lots which adjoin it on both sides or on the lot which adjoins it on one side plus the lot which adjoins it on the rear and the lot or lots which immediately face it across the street, which buildings do not conform to the regulations prescribed by this chapter for the district in which the said lot is located.

E.  The following types of cases shall not be construed as eligible for consideration as hardship cases within the site subsequent to the adoption of this chapter:

(1) The applicant with or without knowledge of the provisions of this chapter has acquired the site subsequent to the effective date of this chapter.

(2) The applicant has caused a self-imposed hardship by changing his circumstances after adoption of this chapter. (Example: The applicant, in selling a portion of a larger site, has either created a new lot which is deficient in total area or has rendered the existing larger segment on which a structure is located insufficient in yard space).

(3) The applicant would realize financial advantage from a change to the site, the structure or the use.

F.  Unless otherwise specified at the time the variance is granted, the variance pertains to the subject property and not the individual who applied. Consequently, the variance is transferable to any future owner of the subject property, but cannot be transferred by the applicant to a different site should he move to another location.

G.  Unless otherwise specified at the time the variance is granted, it pertains to the subject property for an indefinite time. However, in the case where work has not been commenced and diligently prosecuted within one year after the date of granting of a variance, then without further action such variance shall become null and void.

H.   Where the Board finds the zoning classification of a particular property to be conducive to the deprivation of all reasonable use of the land or building by the owner thereof, and where such Board deems the same condition to apply generally to other land or buildings in the same neighborhood and/or district, the Board shall deny a variance on the grounds that the conditions and circumstances are not unique and shall call this condition to the attention of the Planning Board accompanied by a recommendation that this chapter be amended.

I.   In all cases where the Board grants a variance from the strict application of the requirements of this chapter, it shall be the duty of such Board to attach conditions and safeguards as may be required in order that the result of its action be as nearly as possible in accordance with the intent and purposes of this chapter, but excluding any condition, safeguards or limitation based upon the continued ownership of the land or structures to which the variance pertains by the applicant, petitioner or any owner.
     [Amended 6-6-1978 by Doc. 103-C]

## § 255-80 Special permits.

A.   The Board unless herein specified shall have power to hear and decide on applications for special permits for exceptions. The City Council shall have the power to hear and decide on special permit applications for cluster residential development, planned unit development and multifamily dwellings, except that an application to expand an existing residential dwelling up to, and not to exceed, a total of six dwelling units, where no exterior structural changes are required, shall be made before the Board of Appeals in compliance with this and all other applicable regulations of this chapter. In so deciding, the City Council must adhere to the conditions as herein stated as if it were the Board and also with relative conditions stated in Article XI.
     [Amended 6-10-1980 by Doc. 89-C]

B.   Unless otherwise specified at the time the special permit is granted, the special permit pertains to the subject property and not the individual who applied. Consequently, the special permit is transferable to any future owner of the subject property but cannot be transferred by the applicant to a different site should he move to another location.
     [Added 6-6-1978 by Doc. 103-C]

B2.  Permit applications.
     [Added 3-13-1979 by Doc. 299-C; amended 6-9-1981 by Doc. 79-C; 5-22-1984 by Doc. 60-B; 6-10-1992 by Doc. 52-C]

     (1)   Site plan.

           (a)   All applications for a special permit before the Board of Appeals shall be accompanied by a reproducible original and 30 copies of the following described site plan:
                 [Amended 6-25-2002 by Doc. 97-B]

                 [1]   The plan shall be 8 1/2 inches by 11 inches or larger, drawn at a scale of one inch equals 40 feet or such smaller scale as may be necessary, indicating zoning districts, north points, names of streets, names of property owners who abut the subject property and existing property lines, and the exact location of existing buildings and any proposed additions and distances from adjacent buildings and property lines shall be shown on the plan, which shall accurately be drawn in ink on Mylar or linen and signed and stamped by a registered land surveyor.

                 [2]   The dimensions of the lot, percentage of the lot covered by the principal and accessory buildings, the required parking spaces, entrances, exits, driveways, planting strips, signs, etc., that are pertinent to the granting of the special permit shall also be shown.

           (b)   All of the above must be certified as to accuracy of the lot lines, placement of original buildings and of proposals to provide additions to buildings, alterations to lot lines and/or parking, etc.

     (2)   The Board may also require additional information as described in Subsections D and E of this section as determined to be pertinent by the Board.

     (3)   All plans and facade elevations presented with the application shall remain a part of the records of the Board of Appeals. The provision of the plan and the application form shall be the sole responsibility of the applicant.

(4)  If living quarters are to be remodeled, or areas to be converted into living quarters, in addition to the required site plan, nine copies of the following described plan shall be furnished:

(a)  A floor plan of each floor on which remodeling is to be done or areas converted into living quarters;

(b)  A floor plan showing the stairways, halls, door openings into the halls and exit doors of each floor or floors where remodeling or converting is to be done; and

(c)  An elevation of the parts of the building where outside stairways or fire escapes are to be located. The plans and elevations shall be clearly illustrated. The size of each plan shall be 11 inches by 17 inches or 22 inches, it shall be drawn to scale 1/4 inch equals one foot.

(5)  All plans and elevations presented with the application shall remain a part of the records of the Board of Appeals. The provision of the plan and the application shall be the sole responsibility of the applicant.

(6)  An application for a special permit that requires the recording of a plan must be accompanied by a recordable linen or Mylar plan, and said plan must contain a registered land surveyor's seal and signature and must comply with all other recording rules of the Registry of Deeds.

(7)  The Building Inspector, at the time of initial application review, shall confirm to the Board that all site/building plans submitted are in total compliance with the rules and regulations of the Board of Appeals.

C.  All applications for a special permit before the City Council shall be accompanied by a reproducible original and 18 copies of the following described certified site plan prepared by a registered professional engineer and registered land surveyor. The certified site plan shall show the following:
[Added 6-10-1992 by Doc. 52-C]

(1)  The perimeter dimensions of the lot; Assessors Map, lot and block numbers.

(2)  All existing and proposed buildings, structures, building setbacks, parking spaces, driveway openings, distance between buildings, plan view exterior measurements of individual buildings, driveways, service areas and open areas.

(3)  Internal roads, sidewalks and parking areas (width dimensions of paving and indication of number of parking spaces).

(4)  All facilities for sewage, refuse and other waste disposal and for surface water drainage.

(5)  All proposed landscaping features, such as fences, walls, planting areas and walks on the lot and tract.

(6)  Existing major natural features, including streams, wetlands and all trees six inches or larger in caliper (caliper is girth of the tree at approximately waist height).

(7)  Zoning, scale and North arrow (minimum scale of one inch equals 100 feet).

(8)  Total site area in square footage and acres and area to be set aside as public open space, if appropriate.

(9)  Percentage of lot coverage (including the percentage of the lot covered by buildings) and percentage of open space, if appropriate.

(10)  The proposed residential density in terms of dwelling units per acre and types of proposed commercial uses in terms of the respective floor area, and recreation areas, and number of units proposed by type: number of one-bedroom units, two-bedroom units, etc., if appropriate.

(11)  Location sketch map (indicate surrounding streets and properties and any additional abutting lands owned by the applicant).

(12)  Developer's (or his representative's) name, address and phone number.

(13)  Any other information which may include traffic, school, utilities and impact studies deemed necessary by a 2/3 vote of the City Council as the special permit granting authority (SPGA) in order to adequately evaluate the scope and potential

impacts of the proposed project.

D.   The City Council shall require all petitions for special permits for cluster residential development, multifamily dwellings, residential developments in the Watershed Protection Overlay District or planned unit development to meet the certified site plan requirements of Subsection D above, and attached to said plan shall be exterior facade elevation plans and interior unit plans prepared by a registered architect. The architectural plans shall show the following:
[Added 6-10-1992 by Doc. 52-C; amended 6-27-2000 by Doc. 79-H]

(1)   Representative elevation sketches of buildings (indicate height of building and construction material of the exterior facade).

(2)   Typical unit floor plan for residential uses. (Floor plan should be indicated for each type of unit proposed: either one bedroom, two bedrooms or more.) The area in square feet of each typical unit should be indicated.

E.   In applying for a special permit, the applicant need not demonstrate hardship since the basis for the action is of general benefit to the City as a whole. In granting a special permit, the Board and Council, with due regard to the nature and condition of all adjacent structures and uses, and the district within which the same is located, shall find all of the following general conditions to be fulfilled:
[Amended 6-10-1992 by Doc. 52-C]

(1)   The use requested is listed in Table of Use and Parking Regulations as a special permit in the district for which application is made.

(2)   Where pertinent, the use requested also meets the special permit conditions listed in Article XI.

(3)   The requested use is essential or desirable to the public convenience or welfare.

(4)   The requested use will not impair the integrity or character of the district or adjoining zones, nor be detrimental to the health, morals or welfare and will be in conformity with the goals and policies of the Master Plan.

(5)   The requested use provides for convenience and safety of vehicular and pedestrian movement within the site and in relation to adjacent streets, properties and improvements to be demonstrated by a traffic study where pertinent.

(6)   The requested use provides for adequate methods of disposal for sewage, refuse and other wastes, and adequate methods for surface and storm water drainage.

(7)   The requested use provides for adequate off-street loading and unloading of service vehicles.

(8)   The requested use preserves historical buildings and sites.

F.   In addition, the Board and Council shall find that all the special conditions set forth in Article XI, Table 1: Table of Use and Parking Regulations and Table 2: Table of Dimensional and Density Regulations[1] for a particular use are complied with.
[Amended 6-10-1992 by Doc. 52-C]

[1]   Editor's Note: Said tables are included at the end of this chapter.

G.   Comprehensive permit applications shall include certified site and architectural plans, as required by Subsections D and E of this section and any other information as deemed necessary by the City Council as the City Council as special permit granting authority, as described in Subsection I of this section.
[Added 6-10-1992 by Doc. 52-C]

H.   The Board of Appeals or City Council as the special permit granting authority may also impose, in addition to any applicable conditions specified in this chapter, such additional conditions as it finds appropriate to safeguard the neighborhood or otherwise serve the purpose of this chapter. Such conditions shall be imposed in writing, and the applicant may be required to post bond or other security for compliance with said conditions in an amount satisfactory to the City Council as special permit granting authority.
[Added 6-10-1992 by Doc. 52-C]

I.   On application for a special permit before the City Council, the Fire, Building, Health, Water, Police, Wastewater, Engineering, Planning, School and Conservation Departments, and other organizations at the selection of the City Council as special permit granting authority (SPGA), will be requested to review the special permit and provide comments and recommendations. If such comments are not received by the hearing date, the SPGA shall act on the application in the normal manner.
[Added 6-10-1992 by Doc. 52-C]

## § 255-81 Other requirements.
[Amended 6-10-1980 by Doc. 89-C]

The granting of any appeal, application or petition by the Board shall not exempt the applicant from any provision of this chapter not specifically ruled upon by the Board or specifically set forth as excepted in this particular case by a provision of this chapter. It shall be unlawful for any owner or person to reconstruct, convert or alter a structure; or change the use, increase the intensity of the use or extend or displace the use of any building, other structure or lot; or change any required limitations or special conditions imposed by the Board in authorizing a special permit or variance without appealing to the Board as a new case over which the Board shall have complete administrative power to deny, approve or modify.

## § 255-82 Effective decision.
[Added 6-6-1978 by Doc. 103-C]

No variance or special permit, or any extension, modification or renewal thereof, shall take effect until a copy of the decision bearing the certification of the City Clerk that 20 days have elapsed and no appeal has been filed or that, if such appeal has been filed, that it has been dismissed or denied, is recorded in the Essex County Registry of Deeds and indexed in the grantor index under the name of the owner of record or is recorded and noted on the owner's certificate of title. The fee for recording or registering shall be paid by the owner or applicant.

## § 255-83 Repetitive petitions.
[Added 6-6-1978 by Doc. 103-C]

A.   No appeal, application or petition which has been unfavorably and finally acted upon by the Board of Appeals (City Council, where applicable) shall be acted favorably upon within two years after the date of final unfavorable action, unless the Board of Appeals finds by a vote of 4/5 of its members (the City Council, where applicable, finds by a vote of 2/3 of its members) specific and material changes in the conditions upon which the previous unfavorable action was based and describes such changes in the record of its proceedings, and unless all but one of the members of the Planning Board gives written consent thereto, prior to consideration by the Board of Appeals (City Council, where applicable), and after public notice as set forth in § 255-101 is given to parties in interest of the time and place of the proceedings when the question of such consent will be considered.

B.   A filing fee in the amount of $150 shall accompany the application and shall cover the costs for advertising both the City Council and Planning Board public hearings and processing of the petition.
[Added 5-24-1983 by Doc. 70-B]

## § 255-84 Superior or District Court appeal.
[Added 6-6-1978 by Doc. 103-C; amended 12-18-1979 by Doc. 270-C]

A.   Any person aggrieved by a decision of the Board of Appeals, Planning Board or City Council, whether or not previously a party to the proceedings, or any municipal officer or board may appeal to the Superior Court Department for the county in which the land concerned is situated, or to the division of the District Court Department within whose jurisdiction the land is situated, by bringing an action within 20 days after the decision has been filed in the office of the City Clerk. If said appeal is made to said division of the District Court Department, any party shall have the right to file a claim for trial of said appeal in the Superior Court Department within 25 days after the service on the appeal is completed, subject to such rules as the Supreme Judicial Court may prescribe. Notice of the action with a copy of the complaint shall be given to the City Clerk so as to be received within such 20 days. The complaint shall allege that the decision exceeds the authority of the Appeals Board,

Planning Board or City Council and any facts pertinent to the issue and shall contain a prayer that the decision be annulled. There shall be attached to the complaint a copy of the decision appealed from, bearing the date of filing thereof, certified by the City Clerk with whom the decision was filed.

B.  If the complaint is filed by someone other than the original applicant, appellant or petitioner, such original applicant, appellant or petitioner and all members of the Board of Appeals, Planning Board or City Council shall be named as parties defendant with their addresses. To avoid delay in the proceedings, instead of the usual service of process, the plaintiff shall, within 14 days after the filing of the complaint, send written notice thereof, with a copy of the complaint, by delivery or certified mail to all defendants, including the members of the Board of Appeals, Planning Board or City Council and shall within 21 days after the entry of the complaint file with the Clerk of the Court an affidavit that such notice has been given. If no such affidavit is filed within such time, the complaint shall be dismissed. No answer shall be required but an answer may be filed and notice of such filing with a copy of the answer and an affidavit of such notice given to all parties as provided above within seven days after the filing of the answer. Other persons may be permitted to intervene, upon motion. The Clerk of the Court shall give notice of the hearing as in other cases without jury to all parties whether or not they have appeared. The Court shall hear all evidence pertinent to the authority of the Board of Appeals, Planning Board or City Council and determine the facts, and, upon the facts as so determined, annul such decision if found to exceed the authority of such Board of Appeals, Planning Board or City Council or make such other decree as justice and equity may require. The foregoing remedy shall be exclusive, notwithstanding any defect of procedure or of notice other than notice by publication, mailing or posting as required by this chapter, and the validity of any action shall not be questioned for matters relating to defects in procedure or of notice in any other proceedings except with respect to such publication, mailing or posting and then only by a proceeding commenced within 90 days after the decision has been filed in the office of the City Clerk, but the parties shall have all rights of appeal and exception as in other equity cases. All appeals shall be taken in compliance with this chapter and the MGL c. 40A, § 17.

## § 255-85 Withdrawal of petition.
[Added 6-6-1978 by Doc. 103-C]

Any petition for a variance or application for a special permit which has been transmitted to the Board of Appeals, Planning Board or City Council may be withdrawn, without prejudice, by the petitioner prior to the publication of the notice of a public hearing thereon, but thereafter be withdrawn without prejudice only with the approval of the Board of Appeals, Planning Board or City Council.

*LME 3 Hearing June 18 2019*

*(LME 19-3)*

*$5.00*
*25 pd*

*11.1*

## Business Owner Information

Describe Your Role in This Application *
Business Owner

## Applicant Information

ONLY COMPLETE THIS SECTION IF YOU ARE AN ATTORNEY OR AGENT REPRESENTING THE BUSINESS OWNER.

Is the Business Owner a Priority Applicant? *
Yes

IF YES, What Type? *
Economic Empowerment

## Business Information

NB: Payment of Fees is required, but does not guarantee that a permit will be issued. The project must pass all required approvals first.

Name of Establishment *
Haverhill Stem LLC

Type of Establishment. *
Retailer

Business Structure *
Limited Liability Corporation (LLC)

Taxpayer Identification Number (TIN) *
82-5176376

Company Website Address
www.stemhaverhill.com

Business Phone *
978-944-4126

Is the Location Leased or Owner? *
Leased

Which Zone are You Applying for? *
LME-RO: Retail Sales Only

Are You Seeking to Locate in the Waterfront District Area (WDA)? *
Yes

If Another Marijuana Business Within 1/2 mile of Your Property is Approved First, What Will You Do? *
Attempt to Proceed

---

## Corporate Information (Required for Business Entities)

Responses must match information on file with the MA Secretary of State's Office.

Legal Business Name *
Haverhill Stem LLC

Doing Business As (DBA) If Any
Stem

Are You a MA Business Entity? *
Yes

Filing Date w/Secretary of State *
04/04/2018

---

## Corporate Officers & Director Information

## Add Corporate Officers & Director Information

Officer/Director Name
Caroline Pineau

Director/Officer Title
CEO, CFO, Executive Director

Officer/Director Address
25 Bradfields Dr. - Haverhill MA 01830

Officer/Director % Ownership
100

Add Corporate Officers & Director Information

---

## Hours of Operation

Monday *
11am-7pm

Tuesday *

11am-7pm

Wednesday *
11am-7pm

Thursday *
11am-7pm

Friday *
11am-7pm

Saturday *
11am-7pm

Sunday *
12pm-7pm

---

## Liability Agreement

The Applicant and all licensees waive and release the City of Haverhill, its elected officials, employees and agents from any liability for injuries, damages, or liabilities of any kind that result from any arrest or prosecution of the LME owners, operators, employees, clients or customers for a violation of state or federal laws, rules or regulations.

Agree *

---

## Indemnification Agreement

The Applicant, in receiving approvals issued pursuant to this chapter (255), and all licensees, jointly and severally, if more than one, agree to indemnify, defend and hold harmless the City of Haverhill, its elected officials, employees, attorneys, agents, insurers and self-insured pool against all liability, claims and demands on account of injury, loss or damage, including without limitation, claims arising from bodily injury, personal injury, sickness, disease, death, property loss or damage or any other loss of any kind whatsoever, arising out of in in any manner connected with the operation of the LME that is subject of this approval/license.

Agree *

/

---

## New Custom Section



March 25, 2019

John A. Michitson, President
Haverhill City Council
City Hall
4 Summer Street
Haverhill MA 01830

      Re:   <u>Special Permit</u>
               <u>Haverhill Stem LLC</u>

Dear President Michitson and Members of the Haverhill City Council,

      Please be advised that Haverhill Stem LLC waives the sixty-five (65) day statutory requirement for the Council to act on the Special Permit to become a licensed Retail Marijuana Establishment.

      Thank you and please contact me with any questions or concerns you may have.

                                      Sincerely,

                                      Caroline Pineau
                                      Managing Member
                                      Haverhill Stem LLC

Cc: Haverhill City Clerk

5/3/2019                                              ViewPoint Cloud

Marijuana Establishment (LME) Special Permit · Add to a project          📅 Expiration Date     [ Active ]     ⋮

# LME-19-3

📋 **Details**
Submitted on Apr 05, 2019 2:21 PM

📎 **Attachments**
22 files

🖼 **Activity Feed**
Latest activity on May 03, 2019

👤 **Applicant**
Caroline Pineau

📍 **Location**
124 WASHINGTON ST, Haverhill, MA 01832

Timeline                                                                            Add New ▾

☐ **LME Application Fee Payment**
  Paid Apr 5, 2019 at 3:22pm

☐ **Tax Check**
  Completed Apr 8, 2019 at 8:15am

☐ **Water/Sewer Bill Check**
  Completed Apr 9, 2019 at 1:35pm

☐ **City Clerk Review**
  Completed Apr 24, 2019 at 10:02am

☐ **Advisory Committee Approval - AD**
  Completed Apr 24, 2019 at 10:03am

☐ **Advisory Committee Approval - AH**
  Completed Apr 24, 2019 at 10:03am

☐ **Advisory Committee Approval - BC**
  Completed Apr 24, 2019 at 10:03am

☐ **Advisory Committee Approval - RM**
  Completed Apr 24, 2019 at 10:03am

☐ **Advisory Committee Approval - RT**
  Completed Apr 24, 2019 at 10:03am

100

## Hours of Operation

| Monday * ❷ | Tuesday * | Wednesday * | Thursday * | Friday * | Saturday * | Sunday * |
|---|---|---|---|---|---|---|
| 11am-7pm | 11am-7pm | 11am-7pm | 11am-7pm | 11am-7pm | 11am-7pm | 12pm-7pm |

## Liability Agreement

The Applicant and all licensees waive and release the City of Haverhill, its elected officials, employees and agents from any liability for injuries, damages, or liabilities of any kind that result from any arrest or prosecution of the LME owners, operators, employees, clients or customers for a violation of state or federal laws, rules or regulations.

Agree *
☑

## Indemnification Agreement

The Applicant, in receiving approvals issued pursuant to this chapter (255), and all licensees, jointly and severally, if more than one, agree to indemnify, defend and hold harmless the City of Haverhill, its elected officials, employees, attorneys, agents, insurers and self-insured pool against all liability, claims and demands on account of injury, loss or damage, including without limitation, claims arising from bodily injury, personal injury, sickness, disease, death, property loss or damage or any other loss of any kind whatsoever, arising out of in in any manner connected with the operation of the LME that is subject of this approval/license.

Agree *
☑

## New Custom Section

# EXHIBIT B



**U.S. DEPARTMENT OF JUSTICE**

John F. Walsh

*United States Attorney*
*District of Colorado*

---

*1225 Seventeenth Street, Suite 700*      *303-454-0100*
*Seventeenth Street Plaza    (FAX)*         *303-454-0400*
*Denver, Colorado  80202*

March 20, 2012

Stanley Garnett, District Attorney
20th Judicial District
Boulder County Justice Center
1777 6th Street P.O. Box 471
Boulder, CO 80306

Dear Mr. Garnett:

I have received your letter of March 13, 2012 regarding this office's enforcement of federal law prohibiting the sale and distribution of marijuana.   Although I welcome the opportunity for continued dialogue on this complex issue, I respectfully disagree with the position your letter outlines.

Federal law unambiguously prohibits all sale and distribution of marijuana.   In light of "medical marijuana" laws passed in several states, however, the Department of Justice has given U.S. Attorneys around the country guidance as to the appropriate use of federal law enforcement resources with respect to prosecution of persons using marijuana for medical purposes on the advice of a physician, and their immediate caregivers.   In the now well-known *Ogden* and *Cole* memos, the Department leaves enforcement discretion with U.S. Attorney's Offices around the country, counsels that prosecution of persons using marijuana for medical purposes and their immediate caregivers is not ordinarily the best use of federal law enforcement resources, and then reemphasizes that investigation and prosecution of marijuana trafficking remains a priority of the Department, particularly where federal interests require it.

One of those overriding interests – not just for the federal government, but for Colorado government and for local government – is the protection of children and young people from drugs and drug abuse, very much including marijuana abuse.   In the second half of 2010 and in 2011, Colorado saw an explosion in the number of marijuana dispensaries, with dozens opening close to schools.   This office has reviewed information from many sources, including our public schools, as well as hospitals and medical professionals, that shows an alarming and substantial spike in marijuana abuse by children and young people during that same period.

Stanley Garnett, District Attorney
March 20, 2012
Page 2

When this disturbing information came to the attention of this office, we concluded that our responsibility – as federal law enforcement officials, and also as Coloradans living in the very Colorado communities impacted by these alarming trends – required a response. As a result, as part of our overall enforcement efforts against marijuana trafficking, this office has undertaken a focused program to enforce federal laws against drug trafficking near our schools. Under that program, we are sending warning letters to every marijuana dispensary we identify that is operating within 1,000 feet of a school. (I should emphasize that this program is only one part of this office's overall enforcement effort, and does not create by implication a safe harbor for marijuana dispensaries or marijuana cultivation in other locations.) Those letters give dispensaries operating within 1,000 feet of a school a 45-day warning period within which to cease operations or face enforcement action, including but not limited to civil asset forfeiture of the properties involved. As a result of the first set of over 20 letters sent in January, all the dispensaries warned closed voluntarily, and no federal forfeiture or other litigation proved necessary.

This office will continue this program until all marijuana dispensaries in Colorado operating within 1,000 feet of a school have been warned and have ceased operations. To be clear, this program is not at the direction of Washington, D.C., but at my direction as U.S. Attorney and as a Coloradan, exercising the discretion that the Department of Justice has left local U.S. Attorneys to take local circumstances into account in determining how best to address the enforcement of federal laws against marijuana trafficking.

I believe that enforcing federal law to protect our children and young people from drug abuse is not only a legitimate use of federal resources, but a core responsibility for me and this office – and I believe that is our duty as Coloradans as well. That view has only been confirmed by the outpouring of thanks and appreciation this office has received from Coloradans in affected communities for our program to close marijuana dispensaries near schools.

The District Attorney's Office for the 20th Judicial District and the United States Attorney's Office have a long history of cooperation on law enforcement matters, and I look forward to continuing that cooperation.

Sincerely,

JOHN F. WALSH
United States Attorney

JFW/je

# EXHIBIT C



**U.S. DEPARTMENT OF JUSTICE**

John F. Walsh
United States Attorney
District of Colorado

*1225 Seventeenth Street, Suite 700      (303) 454-0100*
*Seventeenth Street Plaza           (FAX) (303) 454-0402*
*Denver, Colorado  80202*

January 12, 2012

Via Certified Mail and First Class Mail

Cert Mail No. 7007 1490 0001 4784 0215

Cert Mail No. 7007 1490 0001 4784 0222

*Re:* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Dear ▓▓▓▓▓▓▓▓▓▓

    I am writing regarding the marijuana dispensary operating under the business name ▓▓▓▓▓ ▓▓., located at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, which property you own or have under your control and management.  This property and the dispensary operating on it is located within 1,000 feet of a school, specifically, ▓▓▓▓▓▓▓▓▓▓.

    Federal law prohibits the manufacture, distribution, and possession of marijuana, except as provided under the strict control provisions of the Controlled Substances Act.   The dispensary is operating in violation of federal law, and the Department of Justice has the authority to enforce the federal law even when such activities may be permitted under state law.   Persons and entities who operate or facilitate the operation of such dispensaries are subject to criminal prosecution and civil enforcement actions under federal law.   Moreover, because the dispensary is operating within 1,000 feet of a school, enhanced federal penalties apply.   See 21 U.S.C. § 860(a).

January 12, 2012
Page 2

The provisions of federal law relating to controlled substances have direct and unambiguous implications for property owners and managers. Specifically, Title 21, United States Code, Section 856(a) provides that it is unlawful to "knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, [a] place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance." A violation of this provision may result in criminal prosecution and civil penalties. In addition, any person or entity with an ownership interest in real property, with knowledge or reason to know that the real property is being used for illegal drug sales, may have his interest in the property forfeited to the government without compensation. See 21 U.S.C. § 881(a)(7).

This letter constitutes formal notification that a marijuana dispensary is operating on the above described property in violation of federal law. You are further advised that the real property is subject to forfeiture, and any money you receive, or have received, from the dispensary owner may also be subject to seizure and forfeiture. This letter also constitutes formal notice that action will be taken to seize and forfeit such property if you do not cause the sale and/or distribution of marijuana and marijuana-infused substances at the above referenced location to be discontinued within 45 days from the date of this letter, specifically, by Monday, February 27, 2012. Your prompt attention to this matter is strongly advised.

Sincerely,

JOHN F. WALSH
United States Attorney

JFW/je

# EXHIBIT D



Office of the Attorney General

Washington, D. C. 20530

January 4, 2018

MEMORANDUM FOR ALL UNITED STATES ATTORNEYS

FROM:       Jefferson B. Sessions, III
            Attorney General

SUBJECT:    Marijuana Enforcement

    In the Controlled Substances Act, Congress has generally prohibited the cultivation, distribution, and possession of marijuana. 21 U.S.C. § 801 *et seq.* It has established significant penalties for these crimes. 21 U.S.C. § 841 *et seq.* These activities also may serve as the basis for the prosecution of other crimes, such as those prohibited by the money laundering statutes, the unlicensed money transmitter statute, and the Bank Secrecy Act. 18 U.S.C. §§ 1956-57, 1960; 31 U.S.C. § 5318. These statutes reflect Congress's determination that marijuana is a dangerous drug and that marijuana activity is a serious crime.

    In deciding which marijuana activities to prosecute under these laws with the Department's finite resources, prosecutors should follow the well-established principles that govern all federal prosecutions. Attorney General Benjamin Civiletti originally set forth these principles in 1980, and they have been refined over time, as reflected in chapter 9-27.000 of the U.S. Attorneys' Manual. These principles require federal prosecutors deciding which cases to prosecute to weigh all relevant considerations, including federal law enforcement priorities set by the Attorney General, the seriousness of the crime, the deterrent effect of criminal prosecution, and the cumulative impact of particular crimes on the community.

    Given the Department's well-established general principles, previous nationwide guidance specific to marijuana enforcement is unnecessary and is rescinded, effective immediately.[1] This memorandum is intended solely as a guide to the exercise of investigative and prosecutorial discretion in accordance with all applicable laws, regulations, and appropriations. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal.

---

[1] Previous guidance includes: David W. Ogden, Deputy Att'y Gen., Memorandum for Selected United States Attorneys: Investigations and Prosecutions in States Authorizing the Medical Use of Marijuana (Oct. 19, 2009); James M. Cole, Deputy Att'y Gen., Memorandum for United States Attorneys: Guidance Regarding the Ogden Memo in Jurisdictions Seeking to Authorize Marijuana for Medical Use (June 29, 2011); James M. Cole, Deputy Att'y Gen., Memorandum for All United States Attorneys: Guidance Regarding Marijuana Enforcement (Aug. 29, 2013); James M. Cole, Deputy Att'y Gen., Memorandum for All United States Attorneys: Guidance Regarding Marijuana Related Financial Crimes (Feb. 14, 2014); and Monty Wilkinson, Director of the Executive Office for U.S. Att'ys, Policy Statement Regarding Marijuana Issues in Indian Country (Oct. 28, 2014).



U.S. Department of Justice

Executive Office for United States Trustees

*Office of the Director*                                    *Washington, DC  20530*

April 26, 2017

Dear Chapter 7 and Chapter 13 Trustees:

Your role in administering bankruptcy estates is indispensable to the effective and lawful functioning of the entire bankruptcy system.  I know that in the past few years, the United States Trustees have reached out to you to ensure that we are informed about all cases assigned to you that involve marijuana assets, which are proscribed under federal law and may not be administered under the Bankruptcy Code.[1]  This directive pertains even in cases in which such assets are not illegal under state law.

In recent months, we have noticed an increase in the number of bankruptcy cases involving marijuana assets.  This is to reiterate and emphasize the importance of prompt notification to your United States Trustee whenever you uncover a marijuana asset in a case assigned to you.   Our goal is to ensure that trustees are not placed in the untenable position of violating federal law by liquidating, receiving proceeds from, or in any way administering marijuana assets.  In some cases, trustees move to dismiss or object to a chapter 13 plan confirmation on grounds unrelated to the controlled substance.  You should continue to file any motions or objections you deem appropriate.   It is the policy of the United States Trustee Program that United States Trustees shall move to dismiss or object in all cases involving marijuana assets on grounds that such assets may not be administered under the Bankruptcy Code even if trustees or other parties object on the same or different grounds.

I appreciate your continued and heightened attention to our directive for prompt notification of all cases involving marijuana assets.  I am grateful for all the work you do every day to uphold the integrity of the bankruptcy system and to satisfy the highest fiduciary standards.  Your accomplishments, while not always heralded, are much appreciated.

Sincerely yours,

Clifford J. White III
Director

cc:      Deputy Director/General Counsel
         United States Trustees
         Assistant United States Trustees

---

[1] Cases involving marijuana assets include cases in which the marijuana assets would leave the estate through exemption or abandonment.

# 𝕳𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕾𝖊𝖓𝖆𝖙𝖊

SENATE CAUCUS ON
INTERNATIONAL NARCOTICS CONTROL
HART SENATE OFFICE BUILDING, ROOM 818-C
WASHINGTON, DC 20510

April 1, 2014

Ms. Jennifer Shasky Calvery
Director
Financial Crimes Enforcement Network
U.S. Department of the Treasury
P.O. Box 39
Vienna, VA 22183

Dear Director Calvery:

The mission of the Financial Crimes Enforcement Network (FinCEN) is to safeguard the nation's financial system from illicit use and to combat money laundering. However, the guidance that FinCEN recently issued regarding the proceeds of illegal marijuana trafficking severely undermines that mission.

As you know, recently the states of Colorado and Washington became the first jurisdictions in the world to legalize the production, trafficking, possession and use of marijuana for recreational purposes. The Controlled Substances Act, however, still bans these activities under federal law.

Last August, the Department of Justice (DOJ) announced that it would not challenge these state laws, despite their obvious conflict with federal law. Additionally, the DOJ issued guidance to prosecutors concerning the enforcement of the Controlled Substances Act that would allow marijuana businesses in these states to operate, notwithstanding their violation of federal law. However, even after the DOJ issued this guidance, financial institutions refused to provide banking services to marijuana businesses. This is not surprising, given the participation of these businesses in illegal activity. In response, on February 14, 2014, FinCEN and the DOJ each issued guidance regarding the proceeds of illegal marijuana trafficking.

Like the memorandum it issued in August, the DOJ's recent guidance was couched in terms of prosecutorial or enforcement discretion. But such discretion may not be properly employed to *facilitate* illegal activity. Similarly, FinCEN's guidance appears focused on *assisting* those businesses that seek to inject the proceeds of criminal activity into the nation's financial system.[1] This turns FinCEN's mission on its head.

---

[1] For example, FinCEN's guidance states that it "should enhance the availability of financial services for . . . marijuana-related businesses." Financial Crimes Enforcement Network, *Guidance: BSA Expectations Regarding Marijuana-Related Businesses*, FIN-2014-G001 (February 14, 2014). Moreover, in the press release accompanying the guidance you stated that "FinCEN seeks to move from the shadows the historically covert financial operations of

FinCEN's guidance purportedly "clarifies how financial institutions can provide services to marijuana-related businesses."[2] However, the guidance is dangerously misleading. Indeed, following the guidance may expose financial institutions to civil or criminal liability. Congress and the President may reconsider marijuana's legality, but until federal law is changed, selling marijuana, laundering marijuana proceeds, and aiding and abetting those activities all remain illegal. Far from *clarifying* the obligations of financial institutions, FinCEN's guidance appears to create uncertainty where none had existed beforehand.

To help Congress, financial institutions, and the American public understand both the basis and the real-world implications of FinCEN's guidance, please answer the following questions:

1.    Given FinCEN's mission to safeguard the nation's banking system from illicit use and to combat money laundering, on what legal authority does it purport to "enhance the availability of financial services" for illegal drug traffickers?

2.    Does FinCEN's guidance alter the federal criminal laws that prohibit the distribution and sale of marijuana, the laundering of marijuana proceeds, and any services that aid and abet these activities?

3.    Does FinCEN's guidance alter the federal criminal laws that subject any proceeds obtained, directly or indirectly, from illegal activity, including the distribution of marijuana, to forfeiture?

4.    Does FinCEN's guidance alter the Bank Secrecy Act's criminal penalties for failing to establish an anti-money laundering program designed "to guard against money laundering through financial institutions"?[3]

5.    Does FinCEN have any authority to exercise enforcement discretion relating to the federal criminal laws referenced above, or to decline to enforce these laws?

6.    Does FinCEN anticipate taking any steps to protect financial institutions from criminal prosecution by the DOJ if a financial institution follows its guidance and provides financial services to illegal drug traffickers?  If so, what are those steps?

7.    Does FinCEN know of any reason why Suspicious Activity Reports filed by a financial institution relating to an illegal marijuana business, perhaps with the name of the marijuana business redacted, may not be used as evidence against that

---

marijuana businesses."  Financial Crimes Enforcement Network, Press Release, *FinCEN Issues Guidance to Financial Institutions on Marijuana Businesses* (February 14, 2014).
[2] Financial Crimes Enforcement Network, *Guidance: BSA Expectations Regarding Marijuana-Related Businesses*, FIN-2014-G001 (February 14, 2014).
[3] *See* 31 U.S.C. §§ 5318(h) & 5322(a).

financial institution, including as a party admission under Federal Rule of Evidence 801(d)(2)?

8.   How many financial institutions asked FinCEN for guidance about whether they could provide services to illegal marijuana businesses prior to the issuance of its guidance?

Thank you for your cooperation and attention in this matter.  We would appreciate a response by April 15, 2014.  Please number your answers in accordance with our questions.  If you have any questions, please do not hesitate to contact Chris Lucas or David Bleich at (202) 224-5225, or Matt Bentrott at (202) 228-3081.

Sincerely,

Senator Charles E. Grassley
Co-Chairman

Senator Dianne Feinstein
Chairman



DIRECTOR

U.S. DEPARTMENT OF THE TREASURY
FINANCIAL CRIMES ENFORCEMENT NETWORK

May 8, 2014

The Honorable Dianne Feinstein
Chairman
Senate Caucus on International
Narcotics Control
United States Senate
818-C Hart Senate Office Building
Washington, DC 20510

The Honorable Charles E. Grassley
Co-Chairman
Senate Caucus on International
Narcotics Control
United States Senate
818-C Hart Senate Office Building
Washington, DC 20510

Dear Chairmen Feinstein and Grassley:

Thank you for your letter dated April 1, 2014, regarding the Financial Crimes Enforcement
Network (FinCEN) guidance clarifying the Bank Secrecy Act (BSA) expectations for financial
institutions seeking to provide services to state-regulated marijuana-related businesses.
Consistent with the Department of Justice's recent announcement on its prosecutorial and
enforcement priorities regarding marijuana-related financial crimes, FinCEN's guidance helps
financial institutions file reports that contain information of high value to law enforcement. As a
result, law enforcement will have greater insight into marijuana-related business activity
generally, and will be able to focus on businesses and activity that present priority concerns. As
requested, responses to your eight questions are set forth below.

<u>Question #1</u>

*Given FinCEN's mission to safeguard the nation's banking system from illicit use and to combat
money laundering, on what legal authority does it purport to "enhance the availability of
financial services" for illegal drug traffickers?*

FinCEN does not purport to enhance the availability of financial services for illegal drug
traffickers. The primary objective of FinCEN's guidance is to enhance financial transparency,
which is core to FinCEN's mission and a fundamental purpose of the BSA. Given law
enforcement's priorities with respect to marijuana-related financial crimes, some financial
institutions may accept the risks associated with providing financial services to state-regulated
marijuana-related businesses. Consistent with its mission, FinCEN wants to ensure that any such
financial activity that occurs is transparent and subject to appropriate anti-money laundering
safeguards.

The Honorable Dianne Feinstein
The Honorable Charles E. Grassley

May 8, 2014                                                                              Page 2

## Question #2

*Does FinCEN's guidance alter the federal criminal laws that prohibit the distribution and sale of marijuana, the laundering of marijuana proceeds, and any services that aid and abet these activities?*

FinCEN's guidance has no impact on the application of federal criminal laws. We defer to the Department of Justice's views on the matter in question as outlined in its separate guidance dated February 14, 2014.

## Question #3

*Does FinCEN's guidance alter the federal criminal laws that subject any proceeds obtained, directly or indirectly, from illegal activity, including the distribution of marijuana, to forfeiture?*

As stated above, we defer to the Department of Justice on all matters pertaining to the criminal treatment of this activity, including issues related to forfeiture.

## Question #4

*Does FinCEN's guidance alter the Bank Secrecy Act's criminal penalties for failing to establish an anti-money laundering program designed "to guard against money laundering through financial institutions?"*

FinCEN's guidance does not alter any provision of the BSA, including the criminal penalties provided for in 31 U.S.C. § 5322 and 31 C.F.R. § 1010.840.

## Question #5

*Does FinCEN have any authority to exercise enforcement discretion relating to the federal criminal laws referenced above, or to decline to enforce these laws?*

Only the Department of Justice has discretion to determine whether to prosecute violations of the BSA. We defer to them on any questions concerning the enforcement of criminal money laundering laws.

The Honorable Dianne Feinstein
The Honorable Charles E. Grassley

May 8, 2014                                                                 Page 3

### Question #6

*Does FinCEN anticipate taking any steps to protect financial institutions from criminal prosecution by the DOJ if a financial institution follows its guidance and provides financial services to illegal drug traffickers? If so, what are the steps?*

FinCEN does not interfere with criminal investigations or prosecutions conducted by the Department of Justice.

### Question #7

*Does FinCEN know of any reason why Suspicious Activity Reports filed by a financial institution relating to an illegal marijuana business, perhaps with the name of the marijuana business redacted, may not be used as evidence against that financial institution, including as a party admission under Federal Rule of Evidence 801(d)(2)?*

FinCEN has no independent litigation authority. We defer to the Department of Justice on any questions concerning the Federal Rules of Evidence. We note, however, that suspicious activity reports (SARs) are confidential, prosecutors must consult with FinCEN's counsel before disclosing SARs in discovery, and, as a matter of policy, FinCEN discourages the use of a SAR against the filing institution as that could chill the filing of such reports in the future.

### Question #8

*How many financial institutions asked FinCEN for guidance about whether they could provide services to illegal marijuana businesses prior to the issuance of its guidance?*

As with all regulatory matters, in the past we have received questions from financial institutions both through our Helpline and at industry-sponsored outreach events where FinCEN was a participant. We do not maintain statistical records on informal contacts with financial institutions or the particular questions asked. To solicit input from the financial industry regarding the provision of financial services to marijuana-related businesses, we discussed the issue at the most recent meeting of the Bank Secrecy Act Advisory Group, a congressionally established forum that brings together representatives from regulatory and law enforcement agencies at the state and federal levels, as well as financial institutions and industry representatives. We have also encouraged financial institutions with questions about the guidance to contact FinCEN, so that we can monitor questions for the purpose of providing any necessary additional guidance.

The Honorable Dianne Feinstein
The Honorable Charles E. Grassley

May 8, 2014                                                                    Page 4


FinCEN is committed to fostering a fair but effective BSA regulatory environment, and we
believe that our recent guidance contributes to that effort.  We are also committed to listening to
concerns and feedback regarding the guidance's effectiveness, and making changes where
appropriate.  If we may be of further assistance on this issue, please contact Patrick O'Brien,
FinCEN's Congressional Liaison, at 202-354-6037.


                                        Sincerely,



                                        Jennifer Shasky Calvery
                                        Director

# EXHIBIT E

United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE
DISTRICT of MASSACHUSETTS

U.S. Attorneys » District of Massachusetts » News

Department of Justice

U.S. Attorney's Office

District of Massachusetts

FOR IMMEDIATE RELEASE                                     Tuesday, July 10, 2018

## Statement from U.S. Attorney Andrew Lelling Regarding the Legalization of Recreational Marijuana in Massachusetts

As of July 1, 2018, the Commonwealth of Massachusetts legalized the distribution of marijuana for recreational and other non-medical uses and, based on public reports, the Cannabis Control Commission is now reviewing applications for licenses to grow and sell marijuana products.

Marijuana distribution, however, remains illegal; it is specifically prohibited by federal law. Because I have a constitutional obligation to enforce the laws passed by Congress, I will not effectively immunize the residents of the Commonwealth from federal marijuana enforcement. My office's resources, however, are primarily focused on combatting the opioid epidemic that claims thousands of lives in the Commonwealth each year.

Having considered these factors, and the experiences of other states that have legalized marijuana distribution for non-medical use, I anticipate focusing my office's marijuana enforcement efforts in the following areas:

- Overproduction:  Despite regulatory efforts to address this problem, licensed outdoor marijuana cultivation still creates a significant risk of overproduction, which in turn creates the risk of illegal, and lucrative, marijuana sales to users in nearby states where recreational marijuana use remains illegal. These out-of-state sales are nearly always cash transactions and so often involve federal tax fraud designed to hide the illicit cash or its true source.

- Targeted Sales to Minors:  Advocates for state-level legalization fail to emphasize the risks marijuana use poses for minors. And, despite state-mandated age requirements, marijuana use among minors will surely now increase. Study after study confirms that regular marijuana use is dangerous to adolescent brain development, a process that appears to continue into a person's early 20s. The targeted sale of marijuana to minors may warrant federal prosecution.

- Organized Crime and Interstate Transportation of Drug Proceeds:  Drug proceeds often finance organized criminal activities. My office will continue to prosecute organized criminal groups, like MS-13, that distribute drugs in violation of federal law, regardless of whether that distribution is legal under state laws. To that end, federal investigators will continue to police the Commonwealth for incoming or outgoing shipments of cash as well as use of the federal banking system.

This list is not exclusive, but only intended to clarify which aspects of the state-level marijuana industry are most likely to warrant federal involvement.  My office will continue to review all potential marijuana enforcement matters on a case-by-case basis, guided by the U.S. Department of Justice's Principles of Federal Prosecution.

---

Component(s):
USAO - Massachusetts

Updated July 10, 2018